**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:17-cv-168

UNITED STATES OF AMERICA,

     v.

PIONEER NATURAL RESOURCES COMPANY
and PIONEER NATURAL RESOURCES USA, INC.

       Defendants

_____

**COMPLAINT**
_____

     Plaintiff, the United States of America, by authority of the Attorney General of the

United States and acting at the request of the Administrator of the United States Environmental

Protection Agency ("EPA"), alleges as follows:

**NATURE OF ACTION**

     1.     This is a civil action under Section 107(a) of the Comprehensive Environmental

Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §

9607, for the recovery of costs incurred by the United States in response to the release or

threatened release of hazardous substances at the Commodore Waste Rock Pile - Operable Unit 1

of the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site (the "OU1 Site").  The

United States also seeks a declaration of liability against Defendants Pioneer Natural Resources

Company ("PNRC") and Pioneer Natural Resources USA, Inc. ("PNR-USA") pursuant to

Section 113(g)(2) of CERCLA, 42 U.S.C. § 113(g)(2), that will be binding in future actions to

recover response costs or damages by the United States related to the OU 1 Site.

1

2.      PNRC is the corporate successor to Pioneer Nuclear, Inc. ("PNI"), which conducted mining operations at the OU1 Site between 1982 and 1986.  PNR-USA is the corporate successor to Mesa Limited Partnership and Mesa Operating Limited Partnership (collectively "Mesa"), which conducted mining operations at the OU1 Site between 1986 and 1989.  PNR-USA is a wholly-owned subsidiary of PNRC.

## JURISDICTION AND VENUE

3.      This court has jurisdiction over this action and the parties hereto pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b); 28 U.S.C. §§ 1331, 1345 and 1367.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 42 U.S.C.  §§ 9607(a) and 9613(b), because the releases or threatened releases of hazardous substances that gave rise to the claim in this action occurred in this district, and because the OU 1 Site is located in this district.

## BACKGROUND AND DESCRIPTION OF THE OU 1 SITE

5.      On September 3, 2008, EPA placed the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site (the "Superfund Site") on the National Priorities List pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and as set forth at 40 C.F.R. Part 300, Appendix B.  See 73 Fed. Reg. 51368 (Sept. 3, 2008).

6.      To manage the environmental cleanup at the Superfund Site, EPA designated the Commodore Waste Rock Pile ("CWRP") as operable unit 1 ("OU1") to address the release and threatened releases of hazardous substances from the CWRP and impacted areas in West Willow Creek.  Although not at issue in this action, EPA designated the Nelson Tunnel as operable unit 2 ("OU2") to address the on-going discharge of acidic, metals-contaminated water from the Nelson

Tunnel and the associated mining complex.

7.      The Superfund Site is located in the San Juan Mountains about 1.5 miles north of the statutory town of Creede in Mineral County, Colorado.  The Superfund Site encompasses part of the historic Creede Mining District extensively mined for silver beginning in 1880s and continuing through to the 1980s.

8.      The CWRP is a large mine waste rock pile located in the West Willow Creek drainage adjacent to the portals of two adits named the Nelson Tunnel and the Commodore No. 5 level tunnel ("Commodore No. 5").

9.      The Nelson Tunnel was constructed in phases by different mining companies between 1892 and 1902 for the purposes of locating ore, haulage, and dewatering mines.  The portal of the Nelson Tunnel is situated on the Tunnel Annex (MS No. 9791A) mining claim. Over time, the Nelson Tunnel was abandoned and partially collapsed.  Although partially collapsed, the Nelson Tunnel continues to drain extensive underground mine workings.

10.     The Commodore No. 5, which is part of the extensive Commodore mine complex today, was constructed by the Commodore Mining Company in the late 1890s.  The portal of the Commodore No. 5 is situated on the Manhattan (MS No. 7460) mining claim approximately 45 vertical feet above the Nelson Tunnel.  The Commodore No. 5 was used for exploration, mining, and haulage of waste rock and ore through the 1980s.

11.     Waste rock from the excavation of the Nelson Tunnel and Commodore No. 5, and from mining operations conducted through the Commodore No. 5 through the 1980s, was cast down the mountainside into the West Willow Creek drainage.  The CWRP is located on the Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672), and Tunnel Annex (MS No. 9791A) mining claims.

3

12.     Layers of cribbing to contain waste rock comprising the CWRP and makeshift hydraulic structures to convey West Willow Creek over and under the CWRP (hereinafter referred to as the "water conveyance system") were installed over many years by several mining companies that operated at the OU1 Site.  At the time that PNI and Mesa began conducting mining operations at the OU1 Site, the water conveyance system included an upper wooden flume to convey West Willow Creek past an upper level of the CWRP and over a crib wall in the drainage channel in what came to be known as the "water fall."  Below the "water fall," West Willow Creek was conveyed past the middle level of the CWRP by a lower wooden flume.  The lower wooden flume was built using cribwall-type construction to hold back waste rock on its uphill side.  The lower wooden flume then discharged the flow into a steel pipe that had been pieced together from parts of railroad tank cars.  The steel pipe carried West Willow Creek through the lower level of the CWRP before discharging it over a crib wall to the channel bed below the CWRP.

13.     As will be described in more detail below, PNI and Mesa, predecessors respectively of PNRC and PNR-USA, conducted mining operations at the OU1 Site.  They used the CWRP as the hub of their mining operations.  At the beginning of their mining operations, PNI stabilized failed cribbing on the upper portion of the CWRP to use the surface as a work area and to dump mine waste on the side of the CWRP.  PNI and Mesa maintained the deteriorating cribbing and water conveyance system, including clearing debris from grizzlies to prevent the water conveyance system from clogging.  They also monitored the deteriorating condition of the cribbing and water conveyance system, and instability of the CWRP.  In 1988, Mesa retained a mining and environmental engineering firm, Steffen Robertson & Kirsten Consulting Engineers ("SRK"), to advise Mesa as to what work was necessary to address the

4

failing cribbing and water conveyance system and unstable CWRP, and to comply with Colorado

mined land reclamation requirements.  SRK recommended that the water conveyance system be

removed, the CWRP be regraded, and a natural self-sustaining stream channel be established.

Mesa did not complete the work that SRK recommended.  Had Mesa completed that work, the

washout of the CWRP in 2005, described below, would have been avoided.

## DEFENDANTS

14.     Pioneer Natural Resources Company (the Defendant PNRC) is a Delaware

corporation that was incorporated on April 2, 1997.  As described in the subparagraphs that

follow, PNRC is the corporate successor to Pioneer Nuclear, Inc. ("PNI") which conducted

mining operations at the OU1 Site between 1982 and 1986.

   a.     Pioneer Corporation was incorporated as a Texas corporation on April 16,

1906.

   b.     PNI was incorporated as a Texas corporation on September 18, 1967, as a

wholly-owned subsidiary of Pioneer Corporation.

   c.     On June 26, 1986, PNI merged with and into Pioneer Corporation, after

which Pioneer Corporation became "responsible and liable for all liabilities and

obligations" of PNI.

   d.     On July 1, 1986, Pioneer Corporation conveyed all of its assets to Mesa

Limited Partnership (excluding a Cash Distribution Amount to shareholders of Pioneer

Corporation), and Mesa Limited Partnership "assume[d] and agree[d] to pay, perform,

and discharge when due" all liabilities and obligations of Pioneer Corporation (other than

a Cash Distribution Amount to shareholders of Pioneer Corporation).  Conveyance

Agreement dated June 30, 1986; Agreement of Sale and Purchase dated March 5, 1986.

5

Pioneer Corporation filed Articles of Dissolution with the Texas Secretary of State on July 1, 1986.

e.    Mesa Limited Partnership was organized as a Delaware Limited Partnership by filing a Certificate of Limited Partnership with the State of Delaware on August 30, 1985, and an Amended and Restated Certificate of Limited Partnership with the State of Delaware on October 17, 1985.  Mesa Operating Limited Partnership was organized as a Delaware Limited Partnership by filing a Certificate of Limited Partnership with the State of Delaware on September 5, 1985, and an Amended and Restated Certificate of Limited Partnership with the State of Delaware on October 17, 1985.  Mesa Limited Partnership owned the limited partnership interests in MOLP and other limited partnerships it controlled.

f.    On December 31, 1991, Mesa Limited Partnership was converted into a corporate form as Mesa Inc., a Texas corporation incorporated on or about August 2, 1991.  Mesa Limited Partnership assigned substantially all its assets, which consisted of limited partnership interests in MOLP and other limited partnerships, to Mesa Inc., and Mesa Inc. assumed substantially all liabilities and obligations of Mesa Limited Partnership. Thereafter, Mesa Limited Partnership filed a Certificate of Cancellation of Registration of Foreign Limited Partnership in Texas on January 27, 1992.  The reason for the cancellation was the "dissolution of the partnership."

g.    On August 7, 1997, Mesa Inc. merged with and into PNRC, after which Mesa Inc. ceased to exist.

h.    In sum, PNRC is the corporate successor to PNI and liable for the CERCLA liabilities of PNI as a past operator at the OU1 Site.

6

15.     Pioneer Natural Resources USA, Inc. (the Defendant PNR-USA), which is a wholly-owned subsidiary of PNRC, is a Delaware corporation that was originally incorporated on December 31, 1997, and re-incorporated on May 1, 2008.  As described in the subparagraphs that follow, PNR-USA is the successor to MOLP which conducted mining operations at the OU1 Site between 1986 and 1989.

a.     MOLP was merged with and into Mesa Operating Company on January 5, 1994 by a series of merger transactions explained in Mesa, Inc.'s SEC Form 8-K filed with the Securities and Exchange Commission on January 11, 1994.  The merger transactions included a conversion of MOLP into shares of common stock of Mesa, Inc. After the conversion of MOLP into shares of common stock of Mesa, Inc., on January 5, 1994, MOLP merged with and into Mesa Sub 1, Inc. (incorporated in the State of Delaware on September 5, 1985).  Mesa Sub 1, Inc. then became responsible for all the liabilities and obligations of MOLP.  Also on January 5, 1994, immediately after the merger of MOLP with and into Mesa Sub 1, Inc., Mesa Sub 1, Inc. changed its name to Mesa Operating Company.

b.     On September 12, 1997, Mesa Operating Company changed its name to PNR-USA.

c.     On December 30, 1997 the following occurred roughly in the following order:

(i).     Pioneer NewSub1, Inc., and Pioneer DebtCo., Inc., were incorporated in the State of Texas as wholly-owned subsidiaries of PNRC.  Pioneer Asset Co., Inc., was incorporated in the State of Texas as a wholly-owned subsidiary of Pioneer DebtCo., Inc.

(ii).     PNR-USA merged with and into Pioneer NewSub1, Inc.  Through this merger the separate existence of PNR-USA ceased and Pioneer NewSub 1 as the surviving corporation was "responsible and liable for all debts, liabilities, and duties of [PNR-USA]."

(iii).    As pertinent to this action, Pioneer NewSub 1, Inc. merged with and into Pioneer AssetCo., and became "responsible for all debts, liabilities, and duties (other than Restructured Debt) of NewSub1."

(iv).    Pioneer AssetCo., Inc., merged with and into Pioneer NewSub2, Inc., and became "responsible and liable for all debts, liabilities, and duties of AssetCo."

(v).     Pioneer NewSub2, Inc., changed its name to Pioneer Natural Resources Company USA, Inc., (the Defendant PNR-USA).

d.     On May 1, 2008, PNR-USA reincorporated itself in the State of Delaware by converting itself from a Delaware entity to a Texas entity, and then back to a Delaware entity.

e.     In sum, PNR-USA is a wholly-owned subsidiary of PNRC, and as the corporate successor to MOLP is liable for the CERCLA liabilities of MOLP as a past operator at the OU1 Site.

## DEFENDANTS' RELATIONSHIP TO THE OU1 SITE

16.     PNI entered into an Exploration Agreement and Option ("Exploration Agreement") with Minerals Engineering Company ("MECO") dated September 9, 1982.  The Exploration Agreement gave PNI the right to conduct exploration activities on mining properties (the "MECO Property") controlled by MECO pursuant to a long-term Mining Lease described in

the next paragraph.

17.     The MECO Property subject to the Exploration Agreement consisted of mining properties that MECO leased with the owners of numerous mining properties in the Creede Mining District pursuant to a Mining Lease dated January 12, 1973, effective from January 1, 1973 through January 28, 1993.  The mining properties included 78 patented, lode, or possessory mining claims covering roughly 1,284 acres and comprising several silver mines and mine adits including the Nelson Tunnel and Commodore No. 5.  The Mining Lease granted MECO the right to explore, prospect, develop, mine, store, remove, sell, or otherwise deal with ore, materials, and minerals on the mining properties.  In exchange for control over the mining properties, the Mining Lease provided that MECO was responsible for all claims, demands, or liabilities arising from its mining related activities on the mining properties.  The Mining Lease required MECO to pay:  a royalty to the owners; the full amount of all ad valorem taxes assessed upon the production or severance of ore from the mining properties; one-half of the amount of ad valorem taxes assessed upon the non-producing mining properties; and all taxes on personal property and improvements MECO placed on the mining properties.

18.     After expending at least $500,000.00 exploring for new mining prospects, the Exploration Agreement provided PNI an option to enter into a joint venture with MECO for the joint development and production from the MECO Property and earn a 55% ownership interest in the MECO Property (later increased to 57%).

19.     PNI exercised the option of entering into a joint venture with MECO.  On June 1, 1983, PNI and MECO entered into a joint venture agreement titled "Development and Operating Agreement" (the "Joint Venture Agreement").  The stated purpose of the Joint Venture Agreement was to provide for operations on the MECO Property by PNI, "including, without

limitation, the development of any and all ore and minerals existing in the Property in commercial quantities; mining, extraction, and processing such ore and minerals; and the conduct of all work, construction, operations, and activities incidental, necessary, or convenient for the above, all for the Joint Account of the parties hereto."  Joint Venture Agreement, Art. 1.

20.     The Joint Venture Agreement defined "Development" to include "excavating and equipping . . . tunnels and openings for the purpose of developing and mining ore and minerals; constructing . . . facilities for . . . storage and for waste . . . ."  *Id.* § 3.6.  "Mining" and "Production" were defined to include the "mining and extraction of ore and minerals in, on, or under the Property by any method; . . . extracting other materials in the course of mining or extracting ore and minerals; disposal of waste and tailings; transportation and handling of ore, minerals, mineral-bearing materials, waste, tailings and product, and all work and operations necessary or convenient for the foregoing."  *Id.* § 3.7.  "Operation" and "operations" were defined to mean "any and all exploration, development, mining, production, or other work or activities permitted hereunder."  *Id.* § 3.8.

21.     As the designated "operator" of the joint venture, PNI was required to prepare a "Development Plan" to bring the MECO Property into production, submit the Development Plan to MECO for approval, and "develop the [MECO] Property in accordance with an approved development plan or plans, and . . . operate the Property for production as contemplated by such development plans. . . ."  *Id.* §§ 6.1 and 9.1.

22.     PNI prepared a Development Plan for the joint venture dated August 30, 1983. PNI submitted the Development Plan to MECO, and MECO approved it.  The Development Plan included "Preparatory Activities" to occur from September 1983 to April 1984.  Those activities included stabilizing the CWRP to ensure that a flat surface on the top of the waste rock pile,

abutting the portal of the Commodore No. 5 tunnel, could be used as a work area to store mining equipment and supplies, stage mining activities, unload rail cars hauling materials out the Commodore No. 5 tunnel, and dump waste rock over the side of the CWRP above West Willow Creek.  To stabilize the work area, the Development Plan specified that:

> Waste material will be pushed up against the failed cribbing.  A row of new cribbing will be installed perpendicular to the present cribbing between the failed portion and the present usable ore chute.  This will provide dependable loader access to the ore chute.

23.     PNI prepared monthly "Creede Project Development Project Reports" and periodic updates for MECO describing work PNI completed on behalf of the joint venture.  A "Creede Project Development Plan Update" dated November 17, 1983 described repairs that had been made to the CWRP as follows:

> The Commodore dump was repaired by the MECO Service crew instead of going through an outside contractor as was planned.  By the end of October, the dump was repaired and the surface track was positioned to handle ore and waste generated from future development activity.

24.     In addition to conducting preparatory work at the CWRP discussed above and as summarized in Creede Project Development Project Reports PNI submitted to MECO, PNI conducted underground mine exploration and development work between 1983 and 1986 that included:  enlarging the Commodore No. 5 Tunnel to allow for the use of larger drilling equipment than had been previously be used in the mine workings; extending a crosscut known as the Peak Drift by a length of roughly 800 feet; and mucking out cave-ins in the Commodore No. 5 tunnel.  Waste rock from this work would have been disposed of on the CWRP.  Extending the Peak Drift alone generated an estimated 2,560 cubic yards of waste rock.

25.     Following the formation of MOLP on July 1, 1986, MOLP became the owner of PNI's interest in the MECO Property, and took over PNI's rights and responsibilities as operator

of the joint venture with MECO until October 6, 1989.  MOLP, as operator of the joint venture,

engaged in mining and related activities including removing approximately 2,246 tons of ore

from the Amethyst No. 5 level, which resulted in the disposal of a now unknown amount mine

waste on the CWRP, and the disposal of an estimated 500 tons of mine waste on the CWRP due

to the rehabilitation of the portal of the Commodore No. 5 tunnel in 1986.

26.     Much of MOLP's activities from July 1, 1986 through October 6, 1989 were

focused on the CWRP and the CWRP Water Conveyance System.  A 1986 Annual Report by

PNI to CoCa Mines, Inc. ("CoCa Mines") which noted that CoCa Mines had succeeded to

MECO's rights under the June 1, 1983 Joint Venture Agreement, documented that "[i]t was

mutually decided by Pioneer/MECO representatives that a new portal should be installed (due to

a cave-in at the Commodore No. 5 Portal), as well as the completion of some badly needed flume

and creek-related repairs."  More details were provided in a Progress Report for the period from

July 1, 1986 to December 31, 1986 as follows.

> There were some badly needed repairs in West Willow Creek immediately adjacent to the
> Commodore No. 5 Mine Dump. . . . The problem concerned the wooden flume and
> possible creeping of the mine dump through which West Willow Creek flows.  These
> hazards were brought to the attention of Pioneer/Mesa by local MECO employees.   It
> was mutually agreed that repairs would be done in 1986 to insure a safe run-off during
> the spring of 1987, and that Mesa would monitor the dump on a regular basis to check for
> movement.  A solution will be sought once and if movement of the dump has been
> established.

27.     As set forth in Paragraphs 28 – 34 which follow, MOLP was aware of the on-

going likelihood of the failure of the CWRP Water Conveyance System, erosion of the CWRP,

and resulting environmental damage.  By February 1987, MOLP had installed survey points on

the CWRP, and monitored the creep of the CWRP on a monthly basis through the summer of

1989.  MOLP tried to keep the CWRP Water Conveyance System functioning until reclamation

work could be completed.

28.     MOLP's Development Progress Report for April 1987 documented that:

Spring run-off is underway, with high water expected by late May or early June. The grizzlies at the Commodore No. 5 mine and Amethyst No. 5 mine were cleaned in preparation for rising water in Willow Creek. . . . Checks on all grizzlies and especially the flume and spillway at the Commodore No. 5 mine are being made daily.  During high water, it will be necessary to man the grizzlies for six (6) hours each night to keep debris from backing up water flow.

29.     MOLP's Development Progress Report for June 1987 documented that:

[T]here may have been some movement on the Commodore No. 5 dump in the area of West Willow Creek. . . . There is no doubt that some damage was done in the area in question by recent high water.  The flume will need a minimum of two to three days work by a crew of two men to repair the known damage.

30.     MOLP's Development Progress Report for August 1987 noted:  "The Commodore No. 5 flume/dump was visited by SRK and Harrison Western Corporation, from Denver, Colorado. . . . Basically, SRK looks to be our best competent bidder for the engineering."

31.     MOLP's Development Progress Report for October 1987 documented that:

Most of the month of October found Randy McClure and I [Riney L. Wilbert, Operations Supervisor] in the bottom of the Commodore 5 mine lower flume, where we were replacing the bottoms and sides of the existing wooden structures.  Discussions with Gene Wardell had led us to hope that our extra care in reinforcing and bracing the flume will give Mesa up to four more years before the major cost of re-channeling West Willow Creek will be necessary.

32.     The SRK Memorandum discussed in Paragraphs 13 above "broke out, discussed, and assigned gross estimated costs to reclamation tasks at each site such that the intent of the Colorado Mined Land Reclamation Act is met."  The specific reclamation requirements for the OU1 Site included, under the heading "mine dump regrading," removing the wooden flume, excavating a trench through the waste rock and re-establishing a natural stream channel, re-grading the CWRP to establish final slopes with adequate stability to prevent failures which could dam the stream, and constructing a small overflow embankment further down West

13

Willow Creek with sufficient detention time to settle out colloidal particles of mine waste in the stream.  In 1988, SRK estimated the costs of that work at $300,000.

33.     MOLP did not complete any of the "mine dump regrading work" for the OU1 Site described in the preceding Paragraph 32 prior to abandoning the OU1 Site and terminating the joint venture with CoCa Mines on October 6, 1989.

34.     On October 6, 1989, MOLP entered into a Purchase and Sale Agreement with CoCa Mines and Creede Resources, Inc., ("CRI") dated October 6, 1989, by which MOLP sold its undivided interest in the MECO Property and the joint venture above to CoCa Mines and CRI.

35.     Neither CoCa Mines nor CRI completed any of the "mine dump regrading work" for the OU1 Site described in Paragraph 32 before they abandoned the OU1 Site and the parent corporation of CoCa Mines, Hecla Mining Company, terminated the Mining Lease described in Paragraph 17 on or about January 28, 1993.

36.     Prior to EPA's completion of the removal action described in Paragraph 39 below, the CWRP Water Conveyance System failed and the CWRP collapsed into West Willow Creek.  Washout from the failure of the CWRP Water Conveyance System and erosion of the CWRP released mine waste contaminated with heavy metals, including arsenic, cadmium, lead, manganese, and zinc, into West Willow Creek.  West Willow Creek drains into Willow Creek, which flows into the Rio Grande River approximately four miles below the Site.

## RESPONSE ACTIONS

37.     Sections 104(a) and (b), and 107 of CERCLA, 42 U.S.C. §§ 9604(a) and (b), and 9607, authorize the President to determine the existence and extent of the release or threatened release of hazardous substances; to take action to remove or remedy such releases in order to

protect the public health or welfare or the environment; and to recover the costs of these actions.

38.     There were releases and threatened releases of hazardous substances into the environment within the meaning of Sections 101(8), (14), and (22), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(8), (14), and (22), and 9607(a), by, among other things, the:  failure and threatened failure of the CWRP Water Conveyance System; instability, creep, and eventual collapse of the CWRP into West Willow Creek; erosion of mine waste from the CWRP into West Willow Creek; and the leaching of heavy metals from the CWRP.

39.     During 2008 and 2009, EPA completed a removal action at the OU1 Site to stabilize the CWRP and construct a clean rip rap channel to convey West Willow Creek around the CWRP, among other things.  The work EPA completed is described in a Removal Summary and As-Built Report dated May 5, 2010, and a final POLREP # 1 (pollution report) dated August 23, 2012.

## CLAIM FOR RELIEF

40.     The allegations contained in Paragraphs 1 through 39 are realleged and incorporated herein by reference.

41.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that, inter alia, the following persons shall be liable under CERCLA for the costs incurred by the United States and the State in responding to the release or threatened release of hazardous substances:  any person who owned or operated any facility at the time hazardous substances were disposed of.

42.     The CWRP and the OU1 Site are each a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

43.     Defendants were each an "owner" and "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), at the time of disposal of mining waste containing

hazardous substances including but not limited to, arsenic, cadmium, lead, manganese, and zinc, on the CWRP or at the OU1 Site.  PNI was an "owner" and "operator" by virtue of the Joint Venture Agreement with MECO and the activities described in Paragraphs 16 – 24 above from on or about June 1, 1983 through June 26, 1989 when PNI became Pioneer Corporation.  MOLP was an "owner" and "operator" by virtue of the Joint Venture Agreement with MECO as the successor to PNI and the activities described in Paragraphs 25 - 34 above from on or about July 1, 1986 through October 6, 1989.

44.     Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), provides that the term "disposal" shall have the meaning provided in Section 1004 of the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act, or "RCRA"), 42 U.S.C § 6903. Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), provides, inter alia, that the term "disposal" includes the "discharge, deposit, . . . dumping, spilling, leaking, or placing of any solid or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment . . . ."  Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), provides, inter alia, that the term "solid waste" includes any "discarded material . . . resulting from mining operations . . . ."

45.     The disposal of hazardous substances occurred, among other things, by:  the preparatory activities described in Paragraphs 22 and 23; the dumping of mine waste on the CWRP as described in Paragraphs 24 and 25; and the repairs to and reconstruction of the CWRP Water Conveyance System as described in Paragraphs 26 - 30.

46.     Arsenic, cadmium, lead, manganese, and zinc are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).   EPA regulations list these substances as hazardous at 40 C.F.R. § 302.4(a) and Table 302.4.

47.     There were "release[s]" or threatened "release[s] of hazardous substances at or from the OU1 Site, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

48.     The actions taken by the EPA connection with the OU1 Site constitute "response" actions within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  As a result of EPA's response actions, the United States has incurred unreimbursed response costs, as defined in Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(25), 9607(a).

49.     Such costs include the costs of all activities taken at the Site pursuant to Section 104(b) and (e) of CERCLA, 42 U.S.C. § 9604(b) and (e), including but not limited to the costs of performance of the removal action at the OU1 Site, together with prejudgment interest, as provided for by Section 107 of CERCLA, 42 U.S.C. § 9607.  These costs also include enforcement costs incurred and to be incurred in connection with the Plaintiffs' efforts to recover its response costs from liable parties.

50.     Through June 30, 2016, EPA incurred $5,397,063 in response costs directly associated with the removal action completed at OU1 (CWRP), and $2,861,790 for investigation costs equally attributable to both OU1 (CWRP) and OU2 (Nelson Tunnel), for a total of $8,258,853.   Accounting for another settlement with CoCa by a Consent Decree approved and entered by this Court on June 15, 2016, EPA has unreimbursed response costs for OU1 (CWRP) of at least $7,718,853.

51.     Pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, responsible parties are liable for "all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan [40 C.F.R. Part 300]."  42 U.S.C. § 9607(a)(4)(A).

52.     The response actions taken by EPA with respect to the OU1 Site, and the costs

17

incurred in connection with those response actions, are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

53.     Pursuant to Sections 107(a)(2) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a)(2) and 9613(g)(2), Defendants are jointly and severally liable to the United States for all unreimbursed costs, including administrative, investigative, and enforcement costs that the United States has incurred, is incurring, or will incur in connection with the response actions taken at the OU1 Site.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States prays that this Court:

A.      Enter judgment in favor of the United States and against Defendants pursuant to Section 107(a)(2), 42 U.S.C. § 9607(a)(2), for all unreimbursed response costs EPA has incurred in connection with response actions relating to the OU1 Site, including prejudgment interest on those sums;

B.      Enter judgment in favor of the United States against the Defendants pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), as to its liability for response costs that will be binding in any subsequent action or actions by the United States against Defendants to recover any further response costs related to the OU1 Site;

C.      Award the United States its costs and expenses for this action; and

D.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

/s/ Jerel L. Ellington
JEREL ("JERRY") L. ELLINGTON
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
999 18th Street, South Terrace, Ste. 370
Denver, Colorado  80202
(303) 844-1363

Of Counsel:

LAURIANNE JACKSON
ERIN AGEE
Enforcement Attorneys
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202