**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0168-WJM-NYW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

PIONEER NATURAL RESOURCES COMPANY, and
PIONEER NATURAL RESOURCES USA, INC.,

    Defendants.

---

**ORDER GRANTING PLAINTIFF'S EARLY MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING CORPORATE SUCCESSOR LIABILITY**

---

In this action brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, the United States, as Plaintiff, seeks to recover from Defendants, Pioneer Natural Resources Company ("Pioneer Natural Resources"), and Pioneer Natural Resources, USA, Inc. ("Pioneer-USA"), certain costs incurred in response to the release (or threatened release) of hazardous waste at the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site, located in Mineral County, Colorado.

Now before the Court is the United States' Early Motion for Partial Summary Judgment on Defendants' Corporate Successor Liability (ECF No. 46), in which the United States seeks a ruling as a matter of law that Defendants "are liable for the CERCLA liabilities, to be determined at a later date" of certain predecessor entities, namely, that (1) Defendant Pioneer Natural Resources is a successor to the CERCLA

liabilities of Pioneer Nuclear, Incorporated (here, "PNI") and (2) that Defendant Pioneer-USA is a successor to the CERCLA liabilities of Mesa Operating Limited Partnership (here, "MOLP") (*id*. at 53). For the reasons explained below, the Motion is granted.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248.

In ruling on summary judgment, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987). "[T]he moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Where, as here, the moving party would have the burden of proof at trial, the movant "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring

forward any specific facts alleged to rebut the movant's case." *Id.* However, "[a]lthough the burden of showing the absence of a genuine issue of material fact is upon the movant, the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (internal quotation marks omitted; alterations incorporated).[1]

## II. FACTUAL BACKGROUND

### A. The Site & Alleged Liability of PNI and MOLP

The Nelson Tunnel/Commodore Waste Rock Pile Superfund Site (the "Site") is located in the San Juan Mountains, just north of the town of Creede, Colorado, in an area with a long history of silver mining. (*See* ECF No. 1 ¶ 7; *id.* at 18.) As alleged by the United States, mining activity commenced there by the 1890s and continued at least through the 1980s. (*Id.* ¶¶ 9–10.) The Environmental Protection Agency ("EPA") has designated two operating units within the Site; relevant here is "OU1," which is the Commodore Waste Rock Pile (the "Rockpile"). (*Id.* ¶ 6.)

In general terms, the United States alleges that over the course of many years, waste rock from mining excavations "was cast down the mountainside into the West Willow Creek drainage," creating the Rockpile; and that "[l]ayers of cribbing to contain

---

[1] The United States' Motion seeks partial summary judgment, without addressing all the elements of any claim or defense. Rule 56 permits such a motion for summary judgment "as to a claim, defense, *or part of a claim or defense*." Fed. R. Civ. P. 56, Advisory Comm. Notes to 2010 Amendment (emphasis added); *see also* 11-56 Jeffrey W. Stempel & Steven S. Gensler, *Moore's Federal Practice—Civil* § 56.122[2] (Matthew Bender ed. 2018) ("The freedom to use summary judgment procedure to address issues or elements of a claim is an important feature of Rule 56, making it a much more useful case management device.").

waste rock" and "makeshift hydraulic structures to convey West Willow Creek over and under the [Rockpile] . . . were installed over many years by several mining companies," including certain wooden flume structures and "a steel pipe . . . pieced together from parts of railroad tank cars."  (*Id.* ¶¶ 11–12.)[2]

In this CERCLA case, the United States alleges that PNI and MOLP, as well as another related entity, Mesa Limited Partnership ("MLP"),[3] conducted mining operations at the Site between 1983 and 1989 (*see id.* ¶¶ 16, 22–26), using the Rockpile "as the hub of their mining operations," and taking certain actions to alter or maintain the "deteriorating cribbing and water conveyance system" (*id.* ¶ 13).[4]  Further, the United States alleges that in 1988 Mesa retained an engineering firm which recommended that certain actions be taken to address the "failing cribbing and water conveyance" and the unstable Rockpile, but that Mesa did not complete those actions, thus failing to prevent a subsequent collapse of the water conveyance system and resulting "washout" that "released mine waste contaminated with heavy metals . . . into West Willow Creek" and in turn into the Rio Grande River.  (*Id.* ¶¶ 13, 36.)[5]

---

[2] Defendants mostly do not dispute this factual summary, but dispute that waste rock was cast down by PNI or Mesa from 1982 to 1989 and deny the characterization of the hydraulic structures as "makeshift" or "pieced together."  (ECF Nos. 61 & 62 ¶¶ 11–12.)

[3] The Court uses the term "Mesa" when referring to MOLP and MLP together, but more often refers to these two entities separately, as is required by the analysis below.

[4] Specifically, the United States claims that PNI "was a past owner and operator" of the Site within the meaning of Section 101(2) of CERCLA, 42 U.S.C. § 9601(9), "from on or about June 1, 1983 through June 26, 1986," and that both MLP and MOLP "were past owners and operators" of the OU1 Site . . . from "on or about July 1, 1986 through October 6, 1989."  (ECF No. 46 at 3–4, ¶¶ 2–3.)

[5] Defendants deny a number of the United States' factual allegations regarding the conduct and alleged liability of PNI and Mesa, including denying that Mesa conducted

4

The Site was placed on the National Priorities List ("NPL") by the EPA on September 3, 2008, as provided under Section 105 of CERCLA, 42 U.S.C. § 9605. (*Id.* ¶ 5; 73 Fed. Reg. 51368 (Sept. 3, 2008).) According to the United States, the EPA completed certain removal and stabilization work in 2008 and 2009. (ECF No. 1 ¶ 39.)

**B.   Corporate Entity History**

The present Motion retells a lengthy corporate history somewhat in the fashion of an Old Testament genealogy, with one company begetting another, and another, through a series incorporations, name changes, sales, and mergers, dating from 1906 through 1997, when the transactions creating the present Defendants, Pioneer Natural Resources and Pionner-USA were completed. (*See generally* ECF No. 46 at 5–35, ¶¶ 9–146.) However, the facts relevant to the presently disputed issues focus only on a few months in 1986, when PNI's parent, Pioneer Corporation, through a series of corporate actions, first merged a number of its subsidiaries into itself, and then transferred its assets and liabilities to Mesa. (*See generally* ECF No. 46 at 6–10, ¶¶ 13–34; ECF Nos. 46-7, 46-9, 46-11, 46-12.) The Court details each of the corporate actions and documents relevant to the present dispute in turn. The following facts are undisputed unless attributed otherwise.

    1.    <u>March 5, 1986 Conveyance Agreement</u>

As memorialized in an "Agreement of Sale and Purchase," dated March 5, 1986 (the "March 5, 1986 Agreement" (ECF No. 46-7)), Pioneer Corporation, MLP, and

---

operations at the Site between 1986 and 1989. (*See* ECF Nos. 61 & 62 ¶ 13.) The Court does not resolve these factual disputes here, and includes the United States' factual allegations only for general context.

5

MOLP entered into an agreement for Pioneer Corporation to sell its assets to MLP, which would, "[i]mmediately upon the acquisition of the assets," "convey, transfer, and contribute the same to the MOLP," together with "Assumed Liabilities," as defined by the March 5, 1986 Agreement. Several provisions of this document are relevant to the disputed issues here.

An initial recital states that the agreement was entered because Pioneer Corporation "desire[d] to contribute to the Buyers . . . all of the assets, properties, goodwill and business" of Pioneer Corporation, "as a going concern." (*Id.* at 2.) The subsequent "Conveyance, Contribution and Transfer of Assets" clause states that "at the Closing," Pioneer "will convey, transfer and contribute to the MLP the Seller's [*i.e.*, Pioneer Corporation's] Assets . . . as provided in Section 3.9" of the Agreement. (*Id.* at 2–3, § 1.1.)

Section 3.9 of the March 5, 1986 Agreement in turn provides that on or before closing, Pioneer Corporation

> and each of its subsidiaries shall have taken all necessary action, including all necessary corporate action, to convey and transfer to the Seller [*i.e.*, Pioneer Corporation] all of the assets, properties and business and to cause the Seller to assume all liabilities and obligations, whether accrued, absolute, contingent or otherwise, of each direct or indirect subsidiary of the Seller as shall be selected by the Buyers and specified to the Seller . . . . Such conveyances shall have been effective to vest in Seller all of the right, title and interest in such assets held by the Seller's subsidiaries immediately prior to such conveyances and to obligate the Seller to pay, perform or discharge all such liabilities . . . .

(*Id.* at 39–40, § 3.9.)[6]

Further, Section 1.2 of the March 5, 1986 Agreement defines the "consideration" to be exchanged for the asset purchase, defining Mesa's obligations and agreement that Pioneer Corporation's assets would be delivered to MLP "in exchange for" a specified stock transfer, and "MLP's assumption of and agreement to pay, perform or discharge the Assumed Liabilities," which were broadly defined to include "all debts, liabilities, obligations, taxes and contracts of the Seller [*i.e.*, Pioneer Corporation] of any kind, character or description, whether accrued, absolute, contingent or otherwise, no matter whether arising before or after the Closing Date." (*Id.* at 2–3, § 1.2.)

2.  June 26–27, 1986 Articles of Merger and Certificate of Merger

On June 26, 1986, Pioneer Corporation executed an "Articles and Plan of Merger," reciting that Pioneer Corporation "desire[d] to . . . succeed to the debts, liabilities and duties of" certain of its wholly-owned subsidiaries, which Pioneer had agreed to convey to MLP. (ECF No. 46-9 at 3 (the "Articles").) The Articles also recited that "Pioneer . . . adopts the following Articles . . . for the purpose of merging . . . . Pioneer Nuclear Inc. [*i.e.*, PNI, together with other subsidiaries] with and into Pioneer [Corporation], with Pioneer [Corporation] being the surviving corporation." (ECF No. 46-9 at 3.)

Significantly, the Articles listed PNI among the listed subsidiaries which, on the effective date of the merger, would "be merged with and into Pioneer Corporation," with

---

[6] All citations to exhibits docketed in support of the United States' Motion are to the page number used in the CM/ECF header, which frequently differs from the documents' internal pagination.

7

the effect that "the separate existence of each Subsidiary shall cease," and Pioneer Corporation would thereafter "have all the rights, privileges, immunities and powers and shall be subject to all the duties and liabilities of each Subsidiary" (ECF No. 46-9 at 4–5, Arts. I, IV.A., IV.D.)[7]

---

[7] The text of the Articles in relevant parts reads as follows:

> Article I.
>
> The name of the parent corporation is Pioneer Corporation, a Texas corporation ("Pioneer"). **The names of the subsidiary corporations are** Amarillo Oil Company, Pinaga, Inc., Pioneer Gas Products Company, **Pioneer Nuclear, Inc.** and Pioneer Production Corporation (each of which is hereinafter referred to as a "Subsidiary" and all of which are collectively hereinafter referred to as the "Subsidiaries").
>
> * * *
>
> Article IV.
>
> * * *
>
> D. <u>Corporate Existence, Powers and Liabilities of the Subsidiaries.</u> On the Effective Date, the separate existence of each Subsidiary shall cease. **Each Subsidiary shall be merged with and into Pioneer** in accordance with the provisions of these Articles and Plan of Merger. Thereafter, **Pioneer** shall have all the rights, privileges, immunities, and powers and **shall be subject to all the duties and liabilities of each Subsidiary.** Pioneer shall thereupon and thereafter possess all the rights, privileges, immunities, and franchises, as well of a public as of a private nature, of each Subsidiary; and all property, real, personal, and mixed, and all debts due on whatever account, of or belonging to or due to each Subsidiary, shall be taken and deemed to be transferred to and vested in Pioneer without further act or deed. **Pioneer shall thenceforth be responsible and liable for all liabilities and obligations of each Subsidiary**; and any claim existing or action or proceeding pending by or against any Subsidiary may be prosecuted as if the Merger had not taken place, or Pioneer may be substituted in such Subsidiary's place.

(ECF No. 46-9 at 4–5 (emphasis added).)

On June 27, 1986, these Articles were filed with the Texas Secretary of State, which the same day issued a "Certificate of Merger of Domestic Corporations into Pioneer Corporation" (the "Certificate of Merger"), identifying PNI among the subsidiaries merged into Pioneer Corporation, and certifying that the Articles of Merger had been received by the Secretary of State and "found to conform to law." (*Id.* at 2.)

3. June 30, 1986 Conveyance and Closing

A "Closing Memorandum" recording the closing of the asset sale documents states that "[t]he Closing was held . . . on June 30, 1986," outlines the steps of the transaction leading up to the closing, and also the steps taken as part of closing. (ECF No. 46-11 at 9.)

On the closing date of June 30, 1986, MLP, MOLP, and Pioneer Corporation executed a "Conveyance From Pioneer Corporation to Mesa Limited Partnership and from Mesa Limited Partnership to Mesa Operating Limited Partnership." (ECF No. 46-12 (the "Conveyance").)

The Conveyance includes the following recital:

> WHEREAS, Pioneer [Corporation] is the successor in interest by merger to title to all of the assets of Amarillo Oil Company, Pinaga, Inc., Pioneer Gas Products Company and Pioneer Production Corporation;

(ECF No. 46-12 at 3.) Notably, this paragraph names all of the subsidiaries that Pioneer Corporation had merged into itself *except for* PNI. (*Compare* ECF No. 46-9 at 3 *with* ECF No. 46-12 at 3.) As addressed below, Defendants rely on this omission to argue the United States has failed to prove PNI's assets passed to Mesa, while the United States argues this omission was evidently an error, and "does not change the

9

operative outcome of the final transaction between Pioneer [Corporation] and MLP." (ECF No. 60 at 18.)

Later clauses of the June 30, 1986 Conveyance refer back to the March 5, 1986 Agreement of Sale and Purchase (ECF No. 46-12 at 1), and define the "Assumed Liabilities" being conveyed to Mesa as including "all liabilities and obligations of Pioneer, fixed or contingent . . . other than any obligation to pay the Cash Distribution Amount," which was a liquidating cash distribution to be paid by Pioneer to its shareholders (*id.* at 6, Art. 1.1(m)).

Consistent with the statements in the March 5, 1986 Agreement, the Conveyance transferred the assets of Pioneer Corporation to MLP (*id.* at 7, § 2.1), and reflects that MLP "assume[d] and agree[d] to pay, perform and discharge when due the Assumed Liabilities" of Pioneer Corporation (*id.* at 8, § 2.4). MLP in turn transferred the assets and liabilities it had just received from Pioneer Corporation to MOLP (*id.*, § 3.1), and MOLP "assume[d] and agree[d] to pay, perform and discharge when due the Assumed Liabilities" (*id.* at 9, § 3.4).[8]

Furthermore, the June 30, 1986 Closing Memorandum summarized that on June 27, 1986, PNI (and other named subsidiaries of Pioneer Corporation) had been "merged into Pioneer." (ECF No. 46-11 at 7, ¶ J.)

The day after the Conveyance, Pioneer Corporation filed Articles of Dissolution. (ECF No. 46-10.)

---

[8] In addition the Conveyance included an "unconditional" and "absolute" guaranty by MLP, "guarantee[ing] the obligations of [MOLP] to pay the Assumed Liabilities pursuant to [the March 5, 1986 Agreement], if and to the extent [MOLP] fails to timely make such payments." (*Id*. at 9, § 3.5.) *See also infra*, note 12.

10

4. Actions After 1986

As detailed in the United States' Motion (and documented in supporting exhibits), after the actions detailed above, MLP was converted into Mesa, Inc., at the end of 1991. (*See* ECF No. 46 at 12–15, 17–18 ¶¶ 47–59, 67–71; ECF No. 46-17.) Mesa, Inc. was in turn merged with and into Defendant Pioneer Natural Resources in 1997. (ECF No. 46 at 19–22, ¶¶ 73–86; ECF No. 46-22.) Defendants do not contest that these actions occurred, nor dispute that they made Pioneer Natural Resources the successor of MLP.[9]

### III. ANALYSIS

**A.  Legal Background**

1. CERCLA Generally

"In 1980, CERCLA was enacted in response to the serious environmental and health risks posed by industrial pollution. As its name implies, CERCLA is a comprehensive statute that grants . . . broad power to command government agencies and private parties to clean up hazardous waste sites." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (internal quotation marks omitted). "Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases, and to establish a financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites."

---

[9] Because Defendants do not contest the United States' factual contentions regarding these post-1986 transactions, nor their legal consequences for present purposes, the Court does not describe them in detail, nor include here a recitation of the transactions related to the undisputed claim that Defendant Pioneer-USA is the corporate successor to MOLP. *See* Part III.B.1. *infra.*

*Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005) (internal quotation marks and citations omitted; alterations incorporated). "Thus, the twin aims of CERCLA are to clean up hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination." *Id.*

As part of CERCLA's statutory framework, "the United States may . . . use the 'Hazardous Substance Superfund' to finance cleanup efforts, which it may then replenish by suits brought under § 107 of the Act against, among others, 'any person who at the time of disposal of any hazardous substance owned or operated any facility.'" *Bestfoods*, 524 U.S. at 55 (quoting 42 U.S.C. § 9607(a)(2); citations omitted).[10]

This case is such a suit, in which the United States seeks to recover response costs from Defendants. (*See* ECF No. 1 ¶ 1; *id.* at 18.) In particular, the United States seeks a judgment against Defendants for "all unreimbursed response costs EPA has incurred" at the Site, as well as a declaratory judgment as to Defendants' liability for response costs under Section 113(g)(2), which would "be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). (ECF No. 1 ¶ 1; *id.* at 18, ¶¶ A. & B.)

---

[10] "Section 107(a) of CERCLA establishes four broad categories of [Potentially Responsible Parties ('PRPs')] that may be liable for the costs incurred in responding to a release or threatened release of a hazardous substance from a facility that causes the incurrence of response costs: [1] Current owners and operators of the facility; [2] Owners and operators at the time of disposal at the facility; [3] Persons who arranged for disposal or treatment, or arranged with a transporter for disposal or treatment, at the facility ('generators'); and [4] Persons who accepted any hazardous substance for transport to the facility selected by that person ('transporters')." 5 *Environmental Law Practice Guide* § 31.01 (2018) (Michael B. Gerrard, ed., Matthew Bender); 42 U.S.C. § 9607(a)(1)–(4). The term "person" includes corporations and other business organizations. *Bestfoods*, 524 U.S. at 55; 42 U.S.C. § 9601(21). Only the alleged owner/operator liability of PNI, MLP, and MOLP is at issue here.

2. Corporate Successor Liability

Since the United States seeks to recover from Defendants as successors to the alleged CERCLA liability of past owners or operators, the present dispute is focused on whether Defendants may be held liable as corporate successors to those entities.

"CERCLA failed to address . . . corporate successor liability." *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir. 1988). However, "[t]he courts of appeals that have addressed the issue are unanimous in recognizing successor liability under CERCLA." *United States v. Gen. Battery Corp.*, 423 F.3d 294, 298 n.3 (3d Cir. 2005) ("*General Battery*") (collecting cases); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 206 (2d Cir. 2006) ("*NSI*") ("CERCLA encompasses successor liability").

"[I]t is now settled that CERCLA incorporates common law principles of indirect corporate liability, including successor liability." *General Battery,* 423 F.3d at 298.[11] There are several common law rules which apply to determine whether a CERCLA defendant may be liable as a corporate successor to a past owner or operator. *See generally* A. Rumsey & M. Daneker, *Superfund Deskbook* at 13–14 (2d ed. 2014).

    a. *Successor Liability Following a Merger*

As a general rule, following a corporate merger, the surviving corporation takes

---

[11] "There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law." *Bestfoods*, 524 U.S. at 64 (as to corporate veil-piercing). Here, the Defendants argue the Court must apply Texas law, and the United States does not argue otherwise. (*See* ECF No. 55 at 11; ECF No. 60.) Since the parties do not dispute the issue, and since it does not appear to make any difference to the present outcome, the Court proceeds for present purposes assuming that Texas law controls the successor liability issues raised here. *Accord United States v. Friedland*, 173 F. Supp. 2d 1077, 1090 n.3 (D. Colo. 2001).

on the liabilities of predecessor entities merged into it. *See, e.g., Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir. 1991) ("For purposes of liability, the surviving corporation and the merged corporation are one and the same." (applying Michigan law)); *Smith Land*, 851 F.2d at 91 ("In general, when two corporations merge pursuant to statutory provisions, liabilities become the responsibility of the surviving company."); 15 *Fletcher Cyc. Corp.* § 7121 (Sept. 2017 update) ("*Fletcher*") ("[I]n all jurisdictions today, the surviving corporation in a statutory merger has the statutory obligation to assume the duties and liabilities of a constituent corporation.").

      b.    *Successor Liability Following an Asset Sale*

By contrast, in an asset sale, the "general rule . . . is that where one company sells or otherwise transfers all its assets to another company, the latter is *not* liable for the debts and liabilities of the transferor." *Fletcher* § 7122 (emphasis added); *NSI*, 460 F.3d at 209 (in CERCLA case, observing that "[u]nder both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities"); *accord Commerce Pub. Corp. v. U.S. Postal Serv.*, 579 F. Supp. 1402, 1406 (N.D. Tex. 1984) ("Under Texas law, the purchasing corporation does not, merely by a purchase of assets, become liable for the debts of the selling corporation." (collecting cases)).

However, there are a number of exceptions to this general rule. Typically, "a buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation

of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *NSI*, 460 F.3d at 209; *accord General Battery*, 423 F.3d at 305; *see also Fletcher* § 7122 (recognizing the same exceptions, noting they "are generally recognized by most courts").

**B.     Defendants' Successor Liability**

The United States seeks summary judgment on two specific issues; although only one is disputed, the Court addresses each in turn.

　　1.　　Pioneer-USA's Successor Liability for MOLP

First, the United States seeks summary judgment on the successor liability of Defendant Pioneer-USA "for the activities of [MOLP]," equivalent to a holding that Pioneer-USA "is the corporate successor of MOLP." (ECF No. 46 at 1, 50.) Defendants do not dispute this claim, conceding that Pioneer-USA "has not denied that it is a 'successor' to [MOLP]," and that the Court "can grant" the United States' Motion on this issue. (ECF No. 55 at 1; *see also* ECF No. 62 ¶ 13 ("PNR-USA admits that PNR-USA is the corporate successor to MLP").)

The Court therefore grants the United States' Motion on this undisputed issue, having reviewed the factual record and arguments included in the United States' Motion, and concluding that the United States is entitled to partial summary judgment under Rule 56(a) as a matter of law.

　　2.　　Pioneer Natural Resources's Successor Liability for PNI

Second, the United States seeks summary judgment on the successor liability of Defendant Pioneer Natural Resources for PNI, that is, a summary judgment holding

that Pioneer Natural Resources "is the corporate successor of PNI." (ECF No. 46 at 1, 50.)

Defendants dispute this contention, arguing the United States "has not come forward with sufficient evidence" to prove this claim as a matter of law, and that for summary judgment purposes, "[g]enuine issues of material fact exist as to the issue of [Pioneer Natural Resources'] corporate successor liability." (*See* ECF No. 55 at 1, 10–11.) However, the Court finds Defendants have not raised any *genuine* dispute that Pioneer Natural Resources succeeded to the liabilities of PNI.

The transactions which occurred in 1986, detailed in Parts II.B.1.–3., *supra*, effectively transferred all of PNI's liabilities first to Pioneer Corporation, via merger, and then to MLP and MOLP, via an asset sale including express assumption of liabilities.

First, the June 26, 1986 Articles of Merger and the June 27, 1986 Certificate of Merger effectively transferred all of PNI's liabilities to Pioneer Corporation. This transfer of liabilities is reflected in the explicit terms of the Articles (*see* ECF No. 46- 9at 3, 4–5), was plainly effected by the Texas statutes (*id.* at 2; ECF No. 46-42 at 5–6; 32 Tex. Bus. Orgs. Code. § 1396-5.06A(5) (1986)), and is consistent with the general rule that in a merger all liabilities are transferred to the surviving corporation, *see Smith Land*, 851 F.2d at 9; *Fletcher* § 7121.

Defendants' arguments suggesting that PNI's liabilities were somehow not transferred to Pioneer Corporation are unavailing. Defendants focus on the "selection" and "specification" provisions of § 3.9 of the March 5, 1986 Agreement, *see* Part II.B.1., *supra*, arguing that Agreement did not require the transfer of *all* of Pioneer

16

Corporation's subsidiaries to Mesa, but only those "specified" by Mesa, and that there is "no evidence" that either MLP or MOLP "'specified to' Pioneer Corporation that they had selected to receive [PNI's] assets and liabilities." (ECF No. 55 at 12–13.)

But whatever uncertainty was left open by the March 5, 1986 Agreement is foreclosed by the June 27, 1986 Articles, which unequivocally merged PNI into Pioneer corporation, explicitly making Pioneer Corporation "responsible and liable for all liabilities and obligations of [PNI]." (ECF No. 46-9 at 5.) Moreover, both the terms of the Articles and Texas statutes establish that "the separate existence" of PNI *ceased* as of the effective date of the Articles, which by statute was the date of "the issuance of the certificate of merger," or June 27, 1986. (*See id.* at 2; ECF No. 46-42 at 5.) Thus, the "separate existence" of PNI (and the other subsidiaries merged into Pioneer Corporation) ended on June 27, 1986, and only Pioneer Corporation survived thereafter, becoming "responsible and liable for all liabilities and obligations" of PNI, and of the other merged subsidiaries. *See* 32 Tex. Bus. Orgs. Code. § 1396-5.06A(2) & (5) (statute docketed at ECF No. 46-42 at 6).

Given the unequivocal nature of the merger, Defendants' focus on the omission of PNI from the list of merged subsidiaries in the Conveyance document executed three days later is irrelevant. By that date, PNI no longer existed. So whether or not the recitals of the June 30, 1986 Conveyance mentioned PNI's prior existence, all of PNI's liabilities had already been transferred into Pioneer Corporation. And Defendants do not, and cannot, dispute that Pioneer Corporation's liabilities were then expressly assumed by MLP and MOLP.

While Defendants argue that the United States has provided "no evidence that

[Mesa] 'selected' to receive the . . . liabilities of [PNI]," and "no evidence that [Mesa] 'specified to' Pioneer Corporation that they had selected to receive [PNI's] assets and liabilities," the Court disagrees, finding the United States has provided *exactly* such evidence, and that it is conclusive. Namely, the June 26, 1986 Articles and the June 27, 1986 Certificate of Merger reflect that PNI *was* merged into Pioneer Corporation before June 30, 1986. As was expressly anticipated by the March 5, 1986 Agreement, this merger was then effected by way of the June 26–27, 1986 Articles and Certificate of Merger, and also explicitly confirmed in the June 30, 1986 Closing Memorandum. These documents, read together, are undisputed and dispositive evidence that the transfer of PNI's liabilities to MLP and MOLP was completed with Mesa's knowledge, and as contemplated in the March 5, 1986 Agreement.

Given the clarity of the record detailed above, the absence of some *additional* documentation or communications showing exactly how or when Mesa "selected" or "specified" that PNI was included in the merger and asset sale hardly reflects that it did not occur. The only *arguably* contrary evidence is the omission of PNI from a single "whereas" recital in the June 30, 1986 Conveyance. But, given the preceding merger, and under the terms of the same document, that omission could have any effect only if it were the case that sometime *after* June 27, 1986 (when PNI ceased to exist) but *before* June 30, 1986 (when the asset sale closed), Pioneer Corporation had divested itself of the exact liabilities that it had just acquired from PNI. But not even Defendants suggest that such an improbable and completely undocumented transfer occurred, and there is no reason to believe that it did. Thus, to the extent there is any factual dispute

regarding the merger of PNI's liabilities into Pioneer Corporation and their subsequent conveyance to Mesa, the Court finds no reasonable jury could find for Defendants on this issue. At most, Defendants have raised a "metaphysical doubt," regarding the transfer of PNI's liabilities to Mesa, but one that does reflect a *genuine* factual dispute under Rule 56 requiring a trial to resolve. See *Champagne Metals*, 458 F.3d at 1084.

Accordingly, the Court grants the United States' Motion on this issue, finding that Pioneer Corporation took on the liabilities of PNI via merger, and that by way of the June 30, 1986 Conveyance, MLP explicitly assumed those same liabilities. At least for present purposes, there is no genuine dispute that Pioneer Natural Resources is the corporate successor of PNI.[12]

---

[12] Although the June 30, 1986 Conveyance also purported to immediately transfer from MLP to MOLP the very same assets and liabilities which MLP had just received from Pioneer Corporation (*see* ECF No. 46-12 at 8–9 §§ 3.1, 3.2, 3.4; *see also* ECF No. 46-8 § 1.2(b)), the Conveyance also includes MLP's "unconditional" and "absolute" guaranty for "the obligations of [MOLP] to pay the Assumed Liabilities" (ECF No. 46-12 at 9, § 3.5). This guaranty also refers back to § 1.2 of the March 5, 1986 Agreement, which expressed "MLP's assumption of and agreement to pay, perform, or discharge the Assumed Liabilities" (which are broadly defined), and § 1.8 of the March 5, 1986 Agreement further repeated that "MLP . . . guarantees the obligations of the MOLP to pay the Assumed Liabilities, if and to the extent the MOLP fails to timely make such payment," and that this amounts to "an absolute guaranty of payment and performance of all of the Assumed Liabilities." (ECF No. 46-7 at 3, 7.) The net effect of these terms appears to make MLP fully liable for the liabilities received from Pioneer Corporation, notwithstanding their nominal transfer to MOLP. Put another way, these guaranty provisions may be viewed as an express assumption of PNI's liabilities by MLP.

The parties' arguments do not address these provisions, and in any event Defendants do not argue that these terms defeat the conclusion that MLP (as opposed to MOLP) became the corporate successor to PNI, and to its liabilities. Defendants argue only that "[b]ecause [MLP] did not select . . . [PNI's] . . . liabilities, [MLP] could not have carried those . . . liabilities into its conversion into Mesa, Inc.," and thence into Defendant Pioneer Natural Resources, and that "it is unclear" whether PNI's assets and liabilities were conveyed "to *any* entity" in 1986. (ECF No. 55 at 14.) Having rejected these arguments, it follows that the liabilities which MLP took on and guaranteed in the June 30, 1986 Conveyance later flowed to MLP's successors.

## IV.  CONCLUSION

For the reasons explained above, the United States' Early Motion for Partial Summary Judgment on Defendants' Corporate Successor Liability (ECF No. 46) is GRANTED.

The parties are DIRECTED to contact the Chambers of U.S. Magistrate Judge Nina Y. Wang no later than **April 23, 2018** to arrange for a status conference or other proceeding deemed appropriate by Judge Wang to address the consequences of this ruling for the remainder of this litigation.

Dated this 18th day of April, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge