IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-00168-WJM-NYW

UNITED STATES OF AMERICA,

   Plaintiff,

v.

PIONEER NATURAL RESOURCES COMPANY and
PIONEER NATURAL RESOURCES USA, INC.,

Defendants.

---

**PIONEER NATURAL RESOURCES COMPANY'S SECOND AMENDED ANSWER
AND DEFENSES, AND FIRST AMENDED COUNTERCLAIM**

---

Defendant Pioneer Natural Resources Company ("PNRC") respectfully submits

this *Second Amended Answer and Defenses, and First Amended Counterclaim*.

## <u>SECOND AMENDED ANSWER TO THE COMPLAINT</u>

PNRC responds to the Complaint (Doc. 1) as follows:

1.    Defendant PNRC admits Plaintiff's characterization regarding the nature of

this action.  If Plaintiff has otherwise asserted any allegations in Paragraph 1, then

Defendant PNRC denies such allegations.

2.    Defendant PNRC denies that PNRC is the corporate successor to Pioneer

Nuclear, Inc. ("**PNI**").  Defendant PNRC admits that PNI conducted limited operations,

primarily consisting of mineral exploration activities, at the Commodore Mine between

1982 and 1986.  Defendant PNRC admits that Pioneer Natural Resources USA, Inc.

("**PNR-USA**") is the corporate successor to Mesa Limited Partnership ("**MLP**").

Defendant PNRC denies that PNR-USA is the corporate successor to MOLP with

respect to any liability for the Commodore Waste Rock Pile – Operable Unit 1 of the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site (the "**OU1 Site**"). Defendant PNRC admits that PNR-USA is a wholly owned subsidiary of PNRC. Defendant PNRC denies that MLP or Mesa Operating Limited Partnership ("**MOLP**") (collectively, "**Mesa**") conducted mining operations at the OU1 Site between 1986 and 1989. If Plaintiff has otherwise asserted any allegations in Paragraph 2, then Defendant PNRC denies such allegations. Defendant PNRC affirmatively states that neither Defendant PNRC, PNI, MLP, MOLP, nor PNR-USA ever owned an interest in the Commodore Waste Rock Pile (herein, the "**Commodore Mine Dump**"), and only had a right to access surface of the property.

3.      Defendant PNRC admits the allegations in Paragraph 3.

4.      Defendant PNRC admits that the OU1 Site is located in this judicial district. Defendant PNRC denies the remaining allegations in Paragraph 4.

5.      Defendant PNRC admits that the Environmental Protection Agency ("**EPA**") published a final rule in the *Federal Register* on September 3, 2008, in which EPA's final rule added the "Nelson Tunnel/Commodore Waste Rock" Site to the National Priorities List at 40 C.F.R. Part 300, App. B.

6.      Defendant PNRC admits that EPA made the designations Plaintiff refers to in Paragraph 6. If Plaintiff has otherwise asserted any allegations in Paragraph 6, then Defendant PNRC denies such allegations.

7.      Defendant PNRC admits the allegations in Paragraph 7.

8.      Defendant PNRC admits that the Commodore Mine Dump is a rock pile formed by rock generated from mining operations and generally located in the area

described in Paragraph 8.   If Plaintiff has otherwise asserted any allegations in Paragraph 8, then Defendant PNRC denies such allegations.

9.   Defendant PNRC admits the general description of the Nelson Tunnel's genesis, location, and function in Paragraph 9.   If Plaintiff has otherwise asserted any allegations in Paragraph 9, then Defendant PNRC denies such allegations.

10.   Defendant PNRC admits that the Commodore Mining Company constructed the Commodore No. 5 in the 1890s, and that the Commodore No. 5 is part of the extensive Commodore mine complex today.   Defendant PNRC further admits that the portal of the Commodore No. 5 sits on the Manhattan (MS No. 7460) mining claim approximately 45 vertical feet above the Nelson Tunnel.   Defendant PNRC denies that the Commodore No. 5 was used for mining and haulage of waste rock and ore through the 1980s.   If Plaintiff has otherwise asserted any allegations in Paragraph 10, then Defendant PNRC denies such allegations.

11.   Defendant PNRC admits that waste rock from the excavation of the Nelson Tunnel and Commodore No. 5 was cast down the mountainside into the West Willow Creek drainage prior to 1982.   Defendant PNRC also admits that waste rock from mining operations conducted through the Commodore No. 5 was cast down the mountainside into the West Willow Creek drainage prior to 1982.   Defendant PNRC denies that waste rock from the excavation of the Nelson Tunnel and Commodore No. 5 was cast down the mountainside into the West Willow Creek drainage from 1982 through 1989, and denies that waste rock from mining operations conducted through the Commodore No. 5 was cast down the mountainside into the West Willow Creek drainage from 1982 through 1989.   Defendant PNRC admits that the Commodore Mine

Dump is located on the Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672) and Tunnel Annex (MS No. 9791A) mining claims.

12.    Defendant PNRC denies Plaintiff's allegation in the first sentence of Paragraph 12 that the hydraulic structures are or were "makeshift" or that the discharge system was "pieced together."   Defendant PNRC further denies that Mesa conducted mining operations at the OU1 Site.  Otherwise, Defendant PNRC admits the allegations in Paragraph 12.

13.    Defendant PNRC denies that PNI is a predecessor of PNRC.  Defendant PNRC admits that PNR-USA is the corporate successor to MLP.  Defendant PNRC admits that PNI conducted limited operations, primarily consisting of mineral exploration activities, at the Commodore Mine between 1982 and 1986.  Defendant PNRC denies that Mesa conducted mining operations at the OU1 Site.  Defendant PNRC denies that PNI and Mesa used the Commodore Mine Dump as the hub of their mining operations and that PNI or Mesa ever conducted mining operations on or below the Commodore Mine Dump.  Defendant PNRC admits that PNI stabilized cribbing on the upper portion of the Commodore Mine Dump, and used the surface of the Commodore Mine Dump as a work area.  Defendant PNRC denies that PNI used the surface of the Commodore Mine Dump to dump mine waste on the side of the Commodore Mine Dump.  Defendant PNRC admits that PNI monitored the condition of the cribbing and water conveyance system and took reasonable steps to maintain the integrity of the system, but Defendant PNRC denies the remaining allegations in Paragraph 13's fourth and fifth sentences. Defendant PNRC admits that Mesa retained Steffen Robertson & Kirsten Consulting Engineers ("**SRK**") in 1988 to provide advice regarding how to break out, discuss, and

assign gross estimated costs to reclamation at the Commodore Mine Dump and other mine sites to meet the intent of the Colorado Mined Land Reclamation Act in the event that active mining operations were to be commenced within the scope of the Colorado Mined Land Reclamation Act; and that Mesa retained SRK in 1988 to provide advice regarding how to address potential reclamation scenarios for historically discontinued mine operations.   The tasks described in relevant portions of the resulting document were not requirements.   They were "potential reclamation scenarios" for various mines in the Creede Mining District, in the event MLP determined to make application to the Colorado Mined Land Reclamation Division for any permits that might be required by that agency.   Such application would have only been made if MLP or the Mesa/CoCa Mines venture determined to continue with a mining joint venture, and that venture never materialized.   Moreover, as acknowledged by the author in the "Background" section, MLP had no rights to process mine waste materials described in the document (which were reserved to Coca Mines), and had no responsibility for reclamation of those materials, other than "some waste rock created during portal rehabilitation at the Commodore and Amethyst Mines."   Defendant PNRC also admits that SRK estimated mine-dump regrading and stream-channeling costs at $300,000.   Defendant PNRC denies the remaining allegations and characterizations in Paragraph 13's sixth, seventh and eighth sentences.   If Plaintiff has otherwise asserted any allegations in Paragraph 13, then Defendant PNRC denies such allegations.   Defendant PNRC states that CoCa Mines, Inc., or its subsidiary, Creede Resources Inc., or both (collectively, "**CoCa Mines**") retained all rights to the Commodore Mine Dump materials under the Exploration Agreement and Option dated September 9, 1982, and the Development and

11424445.5

Operating Agreement dated June 1, 1983 (the "**1983 Development and Operating Agreement**"), and PNI had no ownership interest in or contractual responsibility for the materials contained in the Commodore Mine Dump other than waste rock generated by its own operations.  To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Moreover, Defendant PNRC states that when MOLP re-conveyed the mine properties to Coca Mines in 1989, it paid $1,000,000 toward the cost of mine-dump regrading and stream channelization at and around the Commodore Mine Dump, which was an amount substantially exceeding the amount necessary to reclaim the limited activities performed by PNI and MOLP on the Commodore Mine Dump. When MOLP spent $1,000,000 to fund the continued maintenance and rehabilitation of the flume system, its actions reflect an understanding that the payment would have easily covered the cost of a permanent drainage channel.

14.     Defendant PNRC states that MXP Reincorporation Corp. was incorporated as a Delaware Corporation on April 2, 1997, and its name was changed to Pioneer Natural Resources Company on April 14, 1997.  Defendant PNRC denies PNRC is the corporate successor to PNI.  Defendant PNRC admits that PNI conducted limited operations, primarily consisting of mineral exploration activities, at the Commodore Mine between 1982 and 1986.  If Plaintiff has otherwise asserted any allegations in Paragraph 14, then Defendant PNRC denies such allegations.

a.     Defendant PNRC states that Amarillo Gas Company was incorporated as a Texas corporation on April 16, 1906, and its name was

11424445.5

changed to Pioneer Natural Gas Company on December 31, 1953, and Pioneer Natural Gas Company's name was changed to Pioneer Corporation on April 18, 1975.  If Plaintiff has otherwise asserted any allegations in Paragraph 14(a), then Defendant PNRC denies such allegations.

b.      Defendant PNRC states that Amarillo Minerals, Inc. was incorporated as a Texas corporation on September 18, 1967, and that shares of the authorized capital stock had been subscribed by Amarillo Oil Company, and its name was changed to Pioneer Nuclear, Inc., on March 17, 1970.  If Plaintiff has otherwise asserted any allegations in Paragraph 14(b), then Defendant PNRC denies such allegations.

c.      Defendant PNRC states that Pioneer Corporation adopted an Articles and Plan of Merger dated June 26, 1986, for the purpose of merging Amarillo Oil Company, Pinaga, Inc., Pioneer Gas Products Company, PNI and Pioneer Production Corporation with and into Pioneer Corporation, with Pioneer Corporation being the surviving corporation.   In Paragraph 14(c), Plaintiff purports to quote and summarize from the June 26, 1986 document.  Plaintiff does not provide complete quotation of the document or the quoted sentence. Defendant PNRC admits that Plaintiff has accurately quoted the incomplete portion of the quoted sentence.  If Plaintiff has otherwise asserted any allegations in Paragraph 14(c), then Defendant PNRC denies such allegations.

d.      Defendant PNRC states that Pioneer Corporation and MLP were among the parties to a document titled Agreement of Sale and Purchase dated March 5, 1986, and a document titled Conveyance dated June 30, 1986.  As for

the remainder of Paragraph 14(d)'s first sentence, Plaintiff purports to quote and summarize from the Conveyance dated June 30, 1986.  Plaintiff appears to have incompletely quoted and annotated from the Conveyance dated June 30, 1986.  Plaintiff does not provide the complete quotation and accurate and complete summary of the document or the quoted sentence.  Defendant PNRC admits that Pioneer Corporation filed Articles of Dissolution with the Texas Secretary of State on July 1, 1986.  If Plaintiff has otherwise asserted any allegations in Paragraph 14(d), then Defendant PNRC denies such allegations.

e.      Defendant PNRC admits the allegations in the first two sentences of Paragraph 14(e).  Defendant PNRC denies the last sentence in Paragraph 14(e).  Defendant PNRC states that MLP owned limited partnership interests in MOLP and other limited partnerships at various points in time.

f.      Defendant PNRC states that Mesa Inc. was a party to a Conversion Agreement dated December 31, 1991, which, among other things, describes a transaction dated as of October 9, 1991, between MLP and others.  Defendant PNRC also states that MLP and Mesa Inc. were parties to a document titled Assignment and Assumption Agreement dated December 31, 1991.  In the second sentence of Paragraph 14(f), Plaintiff purports to summarize the Conversion Agreement dated December 31, 1991, and Assignment and Assumption Agreement dated December 31, 1991.  Defendant PNRC denies that Plaintiff has accurately and completely summarized the Conversion Agreement dated December 31, 1991, and Assignment and Assumption Agreement dated December 31, 1991.  Defendant PNRC admits that MLP filed a Certificate of

Cancellation of Registration of a Foreign Limited Partnership in Texas on January 27, 1992, and gives the reason for cancellation being filed as dissolution of the partnership. If Plaintiff has otherwise asserted any allegations in Paragraph 14(f), then Defendant PNRC denies such allegations.

g. Defendant PNRC states that Mesa Inc., Mesa Operating Co., MXP Reincorporation Corp. and Parker & Parsley Petroleum Company were parties to an Agreement and Plan of Merger dated April 6, 1997, and that Mesa Inc. and Pioneer Natural Resources Company filed a Certificate of Merger in Delaware and Texas on August 7, 1997. If Plaintiff has otherwise asserted any allegations in Paragraph 14(g), then Defendant PNRC denies such allegations.

h. Defendant PNRC denies the allegations in Paragraph 14(h).

15. Defendant PNRC admits that PNR-USA is a wholly owned subsidiary of PNRC, and that PNR-USA is a Delaware corporation that was originally incorporated on December 31, 1997. Defendant PNRC denies that PNR-USA is the corporate successor to MOLP with respect to any liability for the OU1 Site. Defendant PNRC denies that Mesa conducted mining operations at the OU1 Site between 1986 and 1989.

a. Defendant PNRC states that Mesa Inc., MOLP and Mesa Sub 1, Inc. were among the parties to an Agreement of Merger dated January 5, 1994, and that a Certificate of Merger of Mesa Operating Limited Partnership into Mesa Sub 1, Inc. was filed January 5, 1994, and that Mesa Inc. filed a Form 8-K dated January 11, 1994. Defendant PNRC further states that the surviving corporation of the merger of MOLP into Mesa Sub 1, Inc. continued in existence under the

9

corporate name Mesa Operating Co.  In the second, third and fourth sentences of Paragraph 15(a), Plaintiff purports to summarize the Agreement of Merger dated January 5, 1994, and Certificate of Merger of Mesa Operating Limited Partnership into Mesa Sub 1, Inc. filed January 5, 1994.  Defendant PNRC denies that Plaintiff has accurately and completely summarized the Agreement of Merger dated January 5, 1994, and Certificate of Merger of Mesa Operating Limited Partnership into Mesa Sub 1, Inc. filed January 5, 1994.  If Plaintiff has otherwise asserted any allegations in Paragraph 15(a), then Defendant PNRC denies such allegations.

b.      Defendant PNRC states that Mesa Operating Co. was among the parties to an Amended and Restated Agreement and Plan of Merger signed on June 26, 1997, and dated as of April 6, 1997, that a Certificate of Merger merging Parker & Parsley Petroleum Company with and into Mesa Operating Company was filed August 7, 1997, and that the Certificate of Merger dated August 7, 1997, states that the surviving corporation was thereby amended to change the name of the surviving corporation to Pioneer Natural Resources USA.  If Plaintiff has otherwise asserted any allegations in Paragraph 15(b), then Defendant PNRC denies such allegations.

c.      Defendant PNRC responds to the allegations in Paragraph 15(c)(i)-(v) as follows:

(i).    Defendant PNRC admits that Pioneer DebtCo, Inc. was incorporated in the State of Texas as a wholly owned subsidiary of PNRC, and that Pioneer NewSub 1, Inc. was

incorporated in the State of Texas.  Defendant PNRC denies that Pioneer NewSub 1, Inc. was incorporated as a wholly owned subsidiary of PNRC.  Defendant PNRC admits that Pioneer AssetCo, Inc. was incorporated in the State of Texas as a wholly owned subsidiary of Pioneer DebtCo., Inc.

(ii).    Defendant PNRC states that a document titled Articles of Merger With Respect to the Merger of Pioneer Natural Resources USA, Inc., a Delaware corporation with and into Pioneer NewSub1, Inc., a Texas corporation dated December 30, 1997, was filed in Texas on December 30, 1997, and a Certificate of Ownership and Merger With Respect to the Merger of Pioneer Natural Resources USA, Inc., a Delaware corporation with and into Pioneer NewSub1, Inc., a Texas corporation dated December 30, 1997, was filed in Delaware on December 30, 1997.  In the second sentence of Paragraph 15(c)(ii), Plaintiff purports to quote and summarize these two documents.  Defendant PNRC denies that Plaintiff has accurately and completely quoted and summarized the documents.  If Plaintiff has otherwise asserted any allegations in the first sentence of Paragraph 15(c)(ii), then Defendant PNRC denies such allegations.

(iii).    Defendant PNRC states that a document titled Articles of

11

Merger With Respect to the Merger of Pioneer NewSub1, Inc. a Texas corporation with and into Pioneer DebtCo, Inc. a Texas corporation and Pioneer AssetCo, Inc. a Texas corporation dated December 30, 1997, was filed with a Certificate of Merger in Texas on December 30, 1997.   In Paragraph 15(c)(iii), Plaintiff purports to quote and summarize these documents.  Defendant PNRC denies that Plaintiff has accurately and completely quoted and summarized the documents.   If Plaintiff has otherwise asserted any allegations in Paragraph 15(c)(iii), then Defendant PNRC denies such allegations.

(iv).   Defendant PNRC states that a document titled Articles of Merger With Respect to the Merger of Pioneer AssetCo, Inc. a Texas corporation with and into Pioneer NewSub2, Inc. a Delaware corporation dated December 30, 1997, was filed in Texas on December 30, 1997, and a Certificate of Ownership and Merger With Respect to the Merger of Pioneer AssetCo, Inc. a Texas corporation with and into Pioneer NewSub2, Inc. a Delaware corporation dated December 30, 1997, was filed in Delaware on December 30, 1997.  In Paragraph 15(c)(iv), Plaintiff purports to quote and summarize these documents.  Defendant PNRC denies that Plaintiff has accurately and completely quoted and

summarized the documents.   If Plaintiff has otherwise asserted any allegations in Paragraph 15(c)(iv), then Defendant PNRC denies such allegations.

(v).    Defendant PNRC states that the documents described in response to Plaintiff's allegations in Paragraph 15(c)(iv) state that the name of the entity that shall survive the merger or the surviving corporation is Pioneer NewSub2, Inc., which, at the effective time of the merger, shall be changed to Pioneer Natural Resources USA, Inc.   If Plaintiff has otherwise asserted any allegations in Paragraph 15(c)(v), then Defendant PNRC denies such allegations.

d.    Defendant PNRC states that by Certificate of Conversion of Pioneer Natural Resources USA, Inc., dated May 1, 2008, Pioneer Natural Resources USA, Inc., a Delaware corporation, converted into Pioneer Natural Resources USA, Inc., a Texas corporation, and by Certificate of Conversion of Pioneer Natural Resources USA, Inc., dated May 1, 2008, Pioneer Natural Resources USA, Inc., a Texas corporation, converted into Pioneer Natural Resources USA, Inc., a Delaware corporation.  If Plaintiff has otherwise asserted any allegations in Paragraph 15(d), then Defendant PNRC denies such allegations.

e.    Defendant PNRC admits that PNR-USA is a wholly owned subsidiary of PNRC.  Defendant PNRC denies that PNR-USA is the corporate successor to MOLP with respect to any liability for the OU1 Site.

16.    To the extent that Plaintiff characterizes the interests at issue in Paragraph 16 as a single mining lease, Defendant PNRC denies such characterization. Defendant PNRC otherwise admits the allegations in Paragraph 16.

17.    To the extent that Plaintiff characterizes the interests at issue in Paragraph 17 as a single mining lease, Defendant PNRC denies such characterization. Defendant PNRC otherwise admits the allegations in Paragraph 17

18.    To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Otherwise, Defendant PNRC admits the allegations in Paragraph 18.

19.    To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Defendant PNRC otherwise admits the allegations in Paragraph 19.

20.    To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Defendant PNRC otherwise admits the allegations in Paragraph 20.

21.    To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the

1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization. Defendant PNRC admits that PNI was required to prepare the "Development Plan" referred to in Paragraph 21. If Plaintiff has otherwise asserted any allegations in Paragraph 21, then Defendant PNRC denies such allegations.

22.     To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization. Defendant PNRC otherwise lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations in Paragraph 22.

23.     To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization. Defendant PNRC otherwise lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations in Paragraph 23.

24.     Defendant PNRC admits that PNI conducted preparatory work at the Commodore Mine Dump and limited underground mine exploration between 1983 and 1986, and disposed of an estimated total of 2436 cubic yards from its mineral exploration work. Defendant PNRC denies that PNI extended the crosscut drift by "roughly 800 feet." Rather, Defendant PNRC states that PNI drove the crosscut drift 528 feet. If Plaintiff has otherwise asserted any allegations in Paragraph 24, then

15

Defendant PNRC denies such allegations.

25.     Defendant PNRC denies the allegations in Paragraph 25.

26.     To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Defendant PNRC denies that much of MOLP's activities from July 1, 1986, through October 6, 1989, were focused on the Commodore Mine Dump and the Commodore Mine Dump Water Conveyance System.  Defendant PNRC admits MOLP performed needed repairs to the wooden flume to prevent movement of the mine dump.  If Plaintiff has otherwise asserted any allegations in Paragraph 26, then Defendant PNRC denies such allegations.

27.     Defendant PNRC denies that MOLP was aware of the alleged on-going likelihood of the failure of the Commodore Mine Dump Water Conveyance System, erosion of the Commodore Mine Dump, or resulting environmental damage.  Defendant PNRC admits the remaining allegations in Paragraph 27.

28.     Defendant PNRC admits the allegations in Paragraph 28.

29.     Defendant PNRC admits the allegations in Paragraph 29.

30.     Defendant PNRC admits the allegations in Paragraph 30.

31.     Defendant PNRC admits the allegations in Paragraph 31.

32.     Defendant PNRC admits that the SRK Memorandum discussed the cost of certain potential reclamation tasks and listed potential reclamation tasks in the event that active mining operations were to be commenced within the scope of the Colorado Mined Land Reclamation Act, and that SRK estimated the cost of certain reclamation

tasks to be $300,000.   Defendant PNRC affirmatively states that active mining operations within the scope of the Colorado Mined Land Reclamation Act were never commenced during the period in which PNI conducted operations.   MOLP did not conduct mineral exploration or mining operations at the OU1 Site.   If Plaintiff has otherwise asserted any allegations in Paragraph 32, then Defendant PNRC denies such allegations.

33.   To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the 1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.   Defendant PNRC states that the mine dump regrading work was not completed before MOLP's association with the OU1 Site concluded because, among other reasons, active mining operations within the scope of the Colorado Mined Land Reclamation Act were never commenced during the period in which PNI conducted operations.   MOLP did not conduct mineral exploration or mining operations at the OU1 Site.   Defendant PNRC affirmatively states that MOLP paid $1,000,000 in the 1989 P&S Agreement with CoCa Mines to cover the cost of mine-dump regrading work that SRK originally estimated would cost $300,000, and that CoCa Mines assumed all liability for the "Property" and at all times through the 1989 P&S Agreement retained ownership of the Commodore Mine Dump.   If Plaintiff has otherwise asserted any allegations in Paragraph 33, then Defendant PNRC denies such allegations.

34.   To the extent that Plaintiff characterizes the 1983 Development and Operating Agreement as a "joint venture" or the relationship among the parties to the

1983 Development and Operating Agreement as a "joint venture," Defendant PNRC denies such characterization.  Defendant PNRC otherwise admits the allegations in Paragraph 34.

35. To the extent that Plaintiff characterizes the interests at issue in Paragraph 35 as a single mining lease, Defendant PNRC denies such characterization. Defendant PNRC admits that the mine dump regrading work was not completed before the listed entities concluded their association with the OU1 Site and the referenced interest or interests were terminated.  If Plaintiff has otherwise asserted any allegations in Paragraph 35, then Defendant PNRC denies such allegations.

36. Defendant PNRC admits that the Commodore Mine Dump water conveyance system failed approximately 16 years after MOLP terminated its interest in the mining property, and that MOLP paid $1,000,000 for remediation of the system. Defendant PNRC lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's remaining allegations in Paragraph 36.

37. In Paragraph 37, Plaintiff purports to summarize 42 U.S.C. §§ 9604(a)-(b) and 9607.  Defendant PNRC denies that Plaintiff has accurately and completely summarized 42 U.S.C. §§ 9604(a)-(b) and 9607.  If Plaintiff has otherwise asserted any allegations in Paragraph 37, then Defendant PNRC denies such allegations.

38. Defendant PNRC denies the allegations in Paragraph 38.

39. Defendant PNRC lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations in Paragraph 39.

40. In response to Plaintiff's allegation in Paragraph 40, Defendant PNRC incorporates by this reference its responses to Plaintiff's allegations in Paragraphs 1-39

11424445.5

of the Complaint as though Defendant PNRC set forth such responses in full in this paragraph.

41.     In Paragraph 41, Plaintiff purports to summarize 42 U.S.C. § 9607(a). Defendant PNRC denies that Plaintiff has accurately and completely summarized 42 U.S.C. § 9607(a).  If Plaintiff has otherwise asserted any allegations in Paragraph 41, then Defendant PNRC denies such allegations.

42.     Defendant PNRC denies the allegations in Paragraph 42.

43.     Defendant PNRC denies the allegations in Paragraph 43.

44.     In Paragraph 44, Plaintiff purports to summarize 42 U.S.C. § 9601(29). Defendant PNRC denies that Plaintiff has completely and accurately quoted 42 U.S.C. § 9601(29).  Plaintiff also purports to annotate and quote 42 U.S.C. §§ 6903(3) and (27).  Plaintiff does not provide complete quotations of 42 U.S.C. §§ 6903(3) and (27). Defendant PNRC admits that Plaintiff has accurately quoted the incomplete portion of 42 U.S.C. § 6903(3).  Defendant PNRC denies that Plaintiff has accurately quoted the incomplete portion of 42 U.S.C. § 6903(27).  If Plaintiff has otherwise asserted any allegations in Paragraph 44, then Defendant PNRC denies such allegations.

45.     Defendant PNRC denies the allegations in Paragraph 45.

46.     In Paragraph 46, Plaintiff purports to summarize 42 U.S.C. § 9601(14) and 40 C.F.R. § 302.4 and Table 302.4.   Defendant PNRC denies that Plaintiff has accurately and completely summarized 42 U.S.C. § 9601(14) and 40 C.F.R. § 302.4 and Table 302.4.  Defendant PNRC admits that arsenic, cadmium, lead and zinc are listed in 40 C.F.R. § 302.4 Table 302.4.   If Plaintiff has otherwise asserted any allegations in Paragraph 46, then Defendant PNRC denies such allegations.

47.     Defendant PNRC denies the allegations in Paragraph 47.

48.     Defendant PNRC denies the allegations in Paragraph 48.

49.     Defendant PNRC denies the allegations in Paragraph 49.

50.     Defendant PNRC lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations in Paragraph 50.

51.     In Paragraph 51, Plaintiff purports to quote and summarize 42 U.S.C. § 9607(a)(4)(A).    Plaintiff does not provide complete quotation of 42 U.S.C. § 9607(a)(4)(A).    Defendant PNRC admits that Plaintiff has accurately quoted the incomplete portion of 42 U.S.C. § 9607(a)(4)(A).   Defendant PNRC denies that Plaintiff has accurately summarized the incomplete portion of 42 U.S.C. § 9607(a)(4)(A).   If Plaintiff has otherwise asserted any allegations in Paragraph 51, then Defendant PNRC denies such allegations.

52.     Defendant PNRC denies the allegations in Paragraph 52.

53.     Defendant PNRC denies the allegations in Paragraph 53.

The remaining allegations in the Complaint constitute Plaintiff's prayer for relief to which no response is required.  If a response is required, then Defendant PNRC denies the allegations in Plaintiff's prayer for relief, and requests that the Court deny Plaintiff the relief that Plaintiff requests.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     The harm alleged in the Complaint is divisible.  Therefore, in the event that Defendant PNRC is found responsible for any harm alleged in the Complaint, and the Court grants any affirmative relief against Defendant PNRC, such relief should be apportioned and limited to the costs of responding to only that portion of the harm

11424445.5

specifically attributable to Defendant PNRC.

2. Plaintiff's claims against Defendant PNRC are barred because any alleged release or threatened release of a hazardous substance and the alleged damages resulting from that release were caused solely by the act or omission of a third party other than Defendant PNRC.

3. Defendant PNRC exercised due care with respect to the alleged hazardous substances concerned in light of all relevant facts and circumstances, and Plaintiff is not entitled to recover some or all of its alleged response costs.

4. The Complaint fails to state a claim upon which relief can be granted.

5. At the alleged time of disposal of any alleged hazardous substances as described in the Complaint, Plaintiff owned the facility at which such hazardous substances were disposed of. Plaintiff is an "owner" under CERCLA. Therefore, in the event that Defendant PNRC is found responsible for any harm alleged in the Complaint, and the Court grants any affirmative relief against Defendant PNRC, such relief should be offset by the sums Plaintiff will have to pay as required under 42 U.S.C. § 9607(a) and 42 U.S.C. § 9613(f)(1).

6. At the alleged time of disposal of any alleged hazardous substances as described in the Complaint, Plaintiff owned the facility at which such hazardous substances were disposed of. Plaintiff is an "owner" under CERCLA and any alleged release or threatened release of a hazardous substance and the alleged damages resulting from that release were caused by the act or omission of Plaintiff, and it would be inequitable to provide Plaintiff the relief it seeks. Accordingly, Plaintiff's claims against Defendant PNRC are barred by the doctrine of unclean hands.

11424445.5

7.     At the alleged time of disposal of any alleged hazardous substances as described in the Complaint, Plaintiff owned the facility at which such hazardous substances were disposed of.  Plaintiff is an "owner" under CERCLA; had knowledge of the facts associated with the disposal of any alleged hazardous substances as described in the Complaint; actively encouraged the behavior associated with the disposal of any alleged hazardous substances as described in the Complaint and intended that its conduct be acted upon to bring about such behavior.  Accordingly, Plaintiff's claims against Defendant PNRC are barred by the doctrine of estoppel.

WHEREFORE, Defendant PNRC respectfully requests that the Court enter judgment in favor of Defendant PNRC and against Plaintiff on each of Plaintiff's claims; that Plaintiff take nothing by its Complaint; that Plaintiff's Complaint, and all claims alleged therein be dismissed with prejudice; and that Defendant PNRC be awarded such other and further relief as the Court may deem proper.

## PNRC'S FIRST AMENDED COUNTERCLAIM

For its counterclaim against the United States of America (the "Government"), PNRC incorporates the allegations set forth in its *First Amended Answer* and *Defenses and Affirmative Defenses* as if fully set forth herein, and further states the following:

1.     The Government owned the land on which the Commodore Waste Rock Pile – Operable Unit 1 of the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site is located, and actively encouraged the creation of the Commodore Mine Dump. By this Counterclaim, PNRC asks the Court to hold the Government liable for its share of any liability for response costs associated with the Commodore Mine Dump.

2.     In this civil action arising under 28 U.S.C. § 2201(a) and the

11424445.5

Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, including 42 U.S.C. §§ 9607(a), 9613(b), 9613(f)(1) and 9613(g)(2), PNRC seeks a declaratory judgment that the Government is jointly and severally liable under CERCLA for past, present, and future costs of removal and remedial action or any other necessary costs of response incurred by any other person consistent with the National Contingency Plan at the OU1 Site, and seeks contribution from the Government on equitable grounds for any response costs allocated to PNRC.

3.      PNRC is a Delaware corporation with a principal office at 5205 N. O'Connor Blvd., Suite 200, Irving, TX 75039.  It is authorized to do business and in good standing in Colorado.

4.      The Government resides in the District of Columbia and may be found throughout the country, including in this district.

5.      The Government includes EPA.

6.      The Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

7.      Venue is proper under 42 U.S.C. § 9613(b).

8.      Under 28 U.S.C. § 2201(a),

> *In a case of actual controversy within its jurisdiction*, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, *any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration,*

> *whether or not further relief is or could be sought.* Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. (emphasis added).

9.      Under 42 U.S.C. § 9620(a)(1), the Government has waived sovereign immunity with respect to PNRC's request for a declaratory judgment in this action.

10.     Under 42 U.S.C. § 9607(a)(2), "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable for the response costs and damages described in 42 U.S.C. § 9607(a)(4)(A)-(D).

11.     Under 42 U.S.C. § 9613(g)(2), in any initial action for recovery of the costs referred to in 42 U.S.C. § 9607:

> the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

12.     Under 42 U.S.C. § 9613(f)(1):

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during … any civil action … under section 9607(a) of this title.…   In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

13.     In the Complaint, ECF No. 1, the Government has brought an initial action under 42 U.S.C. § 9607(a) for the recovery of costs allegedly incurred by the Government in response to the release or threatened release of hazardous substances at the OU1 Site.

14.     PNRC did not cause or contribute to the environmental contamination at the OU1 Site, and denies that it is liable for costs incurred as the result of the alleged

release or threatened release of hazardous substances at the OU1 Site.  However, if it is determined during this civil action that PNRC is liable for any costs, then the Government, as an "owner," is liable to PNRC for contribution under 42 U.S.C. § 9613(f) for some or all amounts that PNRC has incurred and may, in the future, incur.

15.     The Government is liable as an "owner" under 42 U.S.C. § 9607(a)(2) for costs incurred as the result of the alleged release or threatened release of hazardous substances at the OU1 Site because the Government was a "person" who "owned or operated" a "facility" "at which such hazardous substances were disposed of," and the Court can enter a declaratory judgment that the Government is so liable, and allocate response costs to the Government as a liable party as the Court deems equitable.

## Any Person

16.     Under 42 U.S.C. § 9601(21), the Government is a "person."

17.     The Government is a "person" as that term is used in 42 U.S.C. § 9607(a)(2).

## At the Time of Disposal of Any Hazardous Substance

18.     Operable Unit 1 of the OU1 Site consists of the Commodore Mine Dump.

19.     The Government also refers to the Commodore Mine Dump as the "Commodore Waste Rock Pile," "CWRP" and "CMWRP."

20.     The Commodore Mine Dump is a large mine-waste rock pile located in the West Willow Creek drainage adjacent to the portals of an adit named "the Nelson Tunnel" and an adit named "the Commodore No. 5 level tunnel."

21.     The waste rock pile of the Commodore Mine Dump consists mostly of barren and mineralized rock produced during the development of the adit named "the

Nelson Tunnel."

22.    The Nelson Tunnel was constructed in the early 1890s.

23.    The Commodore No. 5 level tunnel was constructed in the 1890s.

24.    The Commodore Mine Dump consists mostly of barren and mineralized rock produced during the 1890s.

25.    The rock produced during the 1890s contained hazardous substances.

26.    The creation of the Commodore Mine Dump in the 1890s and the additional placement of barren and mineralized rock on the Commodore Mine Dump were the disposal of hazardous substances as the term "disposal" is used in CERCLA.

27.    By June 24, 1892, roughly a ton of mineralized material was being deposited on the Commodore Mine Dump *daily*.   The June 24, 1892 edition of the Creede Candle provides the relevant statistic.

## Who Owned or Operated

28.    Under 42 U.S.C. § 9601(20)(A)(ii), an "owner or operator" of a facility is "any person owning or operating such facility."

29.    "Owner" includes, at a minimum, a legal titleholder.

30.    Under the General Mining Act of 1872, as codified at 30 U.S.C. §§ 28 and 28f, Congress provided that citizens may take steps to "locate" mining claims by, at a minimum:  (1) distinctly marking the location on the ground so that its boundaries can be readily traced; (2) recording and submitting the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim; and (3) maintaining the claim by annually performing at least $100 worth of labor or

improvements, or paying a claim maintenance fee.

31.     As codified at 30 U.S.C. § 29, Congress provided that citizens may also seek to convert "unpatented" mining claims into "patented" claims.

32.     The holder of an unpatented claim has superior rights as against third parties but not as against the Government, which retains paramount title.

33.     Issuance of a patent transfers title in the underlying public land from the Government to the patent holder.

34.     The Government owns title to the underlying public land *until* it issues a patent.  If no patent is applied for and issued for an unpatented mining claim, then title to the underlying public land remains in the Government.

35.     The Commodore Mine Dump is located on the Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672) and Tunnel Annex (MS No. 9791) mining claims.

36.     The amended location date for the Manhattan claim dates to 1892.

37.     The claim was located earlier than 1892.

38.     The Government did not issue a patent for the Manhattan claim until 1893.

39.     The Government owned title to the land underlying the Manhattan claim until 1893.

40.     The Government owned the land underlying the Manhattan claim during the time that the materials were being dumped on the claim until the date that the claim was patented.

41.     The amended location date for the Senora claim dates to 1892.

42.     The claim was located earlier than 1892.

11424445.5

43.     The Government did not issue a patent for the Senora claim until 1894.

44.     The Government owned title to the land underlying the Senora claim until 1894.

45.     The Government owned the land underlying the Senora claim during the time that the materials were being dumped on the claim until the date that the claim was patented.

46.     The location date for the Tunnel Annex claim dates to 1895.

47.     The Government did not issue a patent for the Tunnel Annex claim until 1896.

48.     The Government owned title to the land underlying the Tunnel Annex claim until 1896.

49.     The Government owned the land underlying the Tunnel Annex claim during the time that the materials were being dumped on the claim until the date that the claim was patented.

50.     The location date for the Tram claim dates to 1897.

51.     The Government did not issue a patent for the Tram claim until 1899.

52.     The Government owned title to the land underlying the Tram claim until 1899.

53.     The Government owned the land underlying the Tram claim during the time that the materials were being dumped on the claim until the date that the claim was patented.

54.     In addition, the Government owned lands underlying the Commodore Mine Dump extending beyond the lands underlying the Manhattan, Tram, Senora and

Tunnel Annex mining claims.

55.     The Government currently owns lands underlying the area where the Commodore Mine Dump was located.

56.     In those areas, the Government owned the land underlying the Commodore Mine Dump the entire time that the Commodore Mine Dump existed.

57.     The Government "owned or operated" as those terms are used in 42 U.S.C. § 9607(a)(2).

## Any Facility

58.     Under 42 U.S.C. § 9601(9), a facility is "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

59.     The Commodore Mine Dump is a "facility" as that term is used in 42 U.S.C. § 9607(a)(2).

60.     The OU1 Site is a "facility" as that term is used in 42 U.S.C. § 9607(a)(2).

## At Which Such Hazardous Substances Were Disposed Of

61.     Under 42 U.S.C. § 9607(a)(2), past owners and operators are subject to "owner or operator" liability.

62.     For purposes of CERCLA, an owner includes the legal titleholder of contaminated land.

63.     Under CERCLA, liability may be inferred from the totality of the circumstances, and it need not be proven by direct evidence for cases involving older hazardous substance disposal because eyewitness testimony or other direct evidence concerning specific waste disposal practices is rarely available.

11424445.5

64.     During the time that most of the barren and mineralized rock that became the Commodore Mine Dump was deposited, stored, disposed of, or placed or otherwise came to be located on the Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672) and Tunnel Annex (MS No. 9791) mining claims and the lands extending beyond the Manhattan, Tram, Senora and Tunnel Annex mining claims, the Government owned title to the land underlying those claims and lands.

65.     Hazardous substances were disposed of at the Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672) and Tunnel Annex (MS No. 9791) mining claims and the lands extending beyond the Manhattan, Tram, Senora and Tunnel Annex mining claims during the time that the Government owned title to the land underlying those claims and lands.

66.     The Government alleges that a release or threatened release of hazardous substances from those mining claims and the lands extending beyond those mining claims, and otherwise at the OU1 Site, has occurred.  The Government further alleges that the release or threatened release caused the Government to incur necessary response costs consistent with the National Contingency Plan.

67.     From the 1890s, when mineral exploration and development began in the area near the Commodore Mine, to the present, the Government owned lands comprising portions of the OU1 Site and surrounding areas and promoted mineral exploration and extraction activities on those lands in accordance with prevailing federal government policies.  The Government allowed the disposal of waste rock on federally owned lands, and conveyed title to certain lands knowing that waste rock would be piled on those lands, which the Government now—more than a century later—has decided

justifies costly removal and remediation under CERCLA.

68.     During the time that the Government owned title to the land underlying the

Manhattan (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672) and Tunnel

Annex (MS No. 9791) mining claims and the lands extending beyond the Manhattan,

Tram, Senora and Tunnel Annex mining claims, the Government caused or contributed

to the disposal of hazardous substances at the Commodore Mine Dump.

69.     The Government encouraged mining and mining-related activities on its

lands that resulted in creation of the Commodore Mine Dump.

70.     In the General Mining Act of 1872, as codified at 30 U.S.C. § 22,

Congress stated,

> Except as otherwise provided, *all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States* and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.  (emphasis added).

71.     Congress enacted the General Mining Act of 1872 "to promote the

Development of the mining Resources of the United States."   General Mining Act of

1872, ch. 152, 17 Stat. 91 (1872).

72.     In the Bland-Allison Act of 1878, Congress directed,

> *That there shall be coined*, at the several mints of the United States, *silver dollars* of the weight of four hundred and twelve and a half grains Troy of standard silver, as provided in the act of January eighteenth, eighteen hundred thirty-seven, on which shall be the devices and superscriptions provided by said act; *which coins* together with all silver

dollars heretofore coined by the United States, of like weight, and fineness, *shall be a legal tender*, at their nominal value, for all debts and dues public and private, except where otherwise expressly stipulated in the contract. *And the Secretary of the Treasury is authorized and directed to purchase*, from time to time, *silver bullion*, at the market price thereof, not less than two million dollars worth per month, nor more than four million dollars worth per month, *and cause the same to be coined monthly, as fast as so purchased*, into such dollars; and a sum sufficient to carry out the foregoing provision of this act is hereby appropriated out of any money in the Treasury not otherwise appropriated. Bland-Allison Act, ch. 20, § 1, 20 Stat. 25 (1878) (emphasis added).

73.    Congress enacted the Bland-Allison Act of 1878 to "authorize the coinage of the standard silver dollar, and to restore its legal-tender character."

74.    In the Sherman Silver Purchase Act of 1890, Congress directed,

*That the Secretary of the Treasury is hereby directed to purchase*, from time to time, *silver bullion to the aggregate amount of four million five hundred thousand ounces*, or so much thereof as may be offered in *each month*, at the market price thereof, not exceeding one dollar for three hundred and seventy-one and twenty-five hundredths grains of pure silver, and to issue in payment for such purchases of silver bullion Treasury notes of the United States to be prepared by the Secretary of the Treasury, in such form and of such denominations, not less than one dollar nor more than one thousand dollars, as he may prescribe, and a sum sufficient to carry into effect the provisions of this act is hereby appropriated out of any money in the Treasury not otherwise appropriated. Sherman Silver Purchase Act, ch. 708, § 1, 26 Stat. 289 (1890) (emphasis added).

75.    Congress enacted the Sherman Silver Purchase Act of 1890 to direct the Secretary of the Treasury to purchase silver.

76.    During the time that the Government owned the land underlying the claims and lands that would become the Commodore Mine Dump, Congress mandated that the Government purchase silver.

32

77.     Congress' goal was to promote silver mining, including in the area that would become the Commodore Mine Dump.

78.     Congress' passage of the Bland-Allison Act of 1878 caused the price of silver to rise to $1.15 per ounce, and was a key factor in the increase of silver mining in the San Juan Mountains, including in the area that would become the Commodore Mine Dump.

79.     In 1886, the price of silver decreased.

80.     Congress' passage of the Sherman Silver Purchase Act of 1890 caused the price of silver to rise again to $1.05 per ounce.

81.     In the 1890s, millions of fine ounces of silver and millions of pounds of lead were produced from the Creede District in the San Juan Mountains.

82.     For example, in 1893, more than 4 million fine ounces of silver were produced from the Creede District in the San Juan Mountains.

83.     At one point in 1898, the average tonnage per month produced from the Commodore Mine was 7500 tons, with an average assay value of 70 ounces of silver per ton.

84.     The Government owned the lands where the waste rock from these activities was deposited, stored, disposed of, or placed or otherwise came to be located.

85.     The Government knew that miners were depositing tons of waste rock and other materials on the land over which the Government held legal title.

86.     When allegedly hazardous substances were disposed of at the OU1 Site, the Government owned the facility at which such hazardous substances were disposed of.   The Government had knowledge of the facts associated with the disposal of

hazardous substances.  The Government actively encouraged the behavior associated with the disposal of alleged hazardous substances.  And the Government intended that its conduct be acted upon to bring about such behavior.  For more than a century, the Government did not do anything to exercise due care with respect to the hazardous substances at issue; and the Government did not take any precautions against foreseeable acts or omissions of third parties with respect to those substances. Accordingly, the Government should be held liable for response costs and remediation associated with the Commodore Waste Rock Pile and OU1 Site

## Notice of Actions

87.    PNRC has provided or, concurrently with this filing, will provide a copy of this counterclaim to the Attorney General of the United States and to the Administrator of EPA as required by 42 U.S.C. § 9613(*l*).

## CLAIM FOR RELIEF

88.    PNRC incorporates by this reference its allegations in Paragraphs 1-87 of its Counterclaim as though PNRC set forth such responses in full in this paragraph.

89.    CERCLA, under 42 U.S.C. § 9613(f)(1), provides any person with a right of contribution from any other potentially responsible party under 42 U.S.C. § 9607(a) during or following any civil action under 42 U.S.C. § 9607(a).

90.    The Government has brought an initial action under 42 U.S.C. § 9607(a) against PNRC with respect to the OU1 Site.

91.    The Government is a potentially responsible party under 42 U.S.C. § 9607(a) for the costs of removal and remediation and other response costs at the OU1 Site as the owner of the site or area at the OU1 Site at the time hazardous

substances were disposed of there.

92.    It would be inequitable to require PNRC to pay the total amount of any costs of removal and remediation and other response costs at the OU1 Site.

93.    While PNRC did not cause or contribute to the environmental contamination at the OU1 Site and denies that it is liable for costs incurred as the result of the alleged release or threatened release of hazardous substances at the site, if it is determined that PNRC is liable for any costs, then the Government is liable to PNRC for contribution under 42 U.S.C. § 9613(f) for some or all amounts that PNRC has incurred and may, in the future, incur as the result of the release or threatened release of hazardous substances from the OU1 Site.

94.    Further, under 28 U.S.C. § 2201(a) and 42 U.S.C. § 9613(g)(2), the Court must enter a binding declaratory judgment on liability for response costs or damages.

95.    A case of actual controversy exists within this Court's jurisdiction regarding the rights and other legal relations of PNRC and the Government regarding the Government's liability for costs and damages associated with the Commodore Mine Dump and OU1 Site.

96.    PNRC is entitled to a declaratory judgment that Government is liable under CERCLA for costs and damages that PNRC has incurred and may, in the future, incur associated with the Commodore Mine Dump and OU1 Site.

## **PRAYER FOR RELIEF**

WHEREFORE, PNRC respectfully requests that the Court enter judgment, pursuant to 42 U.S.C. § 9613(f)(1) in favor of PNRC and against the Government for the Government's equitable share of costs incurred and that may, in the future, be incurred

11424445.5

as the result of the release or threatened release of hazardous substances from the OU1 Site; and declaratory judgment on liability in favor of PNRC and against the Government that will be binding in this action and any subsequent actions to recover costs incurred under CERCLA in connection with the Commodore Mine Dump and OU1 Site, with any applicable interest, and that PNRC be awarded any attorneys' fees and costs allowed by law and such other and further relief as the Court may deem proper.

Respectfully submitted this 6th day of June, 2018.

s/ *Ivan L. London*
Ivan L. London
Henry W. Ipsen
Michael J. Hofmann
Cliff Stricklin
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Co  80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
Email:  ivan.london@bclplaw.com
hank.ipsen@bclplaw.com
michael.hofmann@bclplaw.com
cliff.stricklin@bclplaw.com

*Attorney for Pioneer Natural Resources*
*Company and Pioneer Natural Resources*
*USA, Inc.*

11424445.5

# CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2018, a true and correct copy of the foregoing **PIONEER NATURAL RESOURCES COMPANY'S SECOND AMENDED ANSWER AND DEFENSES, AND FIRST AMENDED COUNTERCLAIM,** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following email addresses:

Stacy D. Coleman
Thomas P. Kolkin
Nicholas J. Morales
Alexandra B. Sherertz
U.S. Department of Justice-DC-7611
P.O. Box 7611
Environment & Natural Resources Division
Washington, DC 20044-7611
stacy.coleman@usdoj.gov
thomas.kolkin@usdoj.gov
nicholas.morales@usdoj.gov
alexandra.sherertz@usdoj.gov


Alan D. Greenberg
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80212
alan.greenberg@usdoj.gov


*s/ Marvene Muñiz*
Marvene Muñiz

11424445.5