**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0168-WJM-NYW

UNITED STATES OF AMERICA,

     Plaintiff,

v.

PIONEER NATURAL RESOURCES COMPANY, and
PIONEER NATURAL RESOURCES USA, INC.,

     Defendants.

_____

**ORDER DENYING UNOPPOSED MOTION TO ENTER CONSENT DECREE**
_____

The United States brings suit against Defendants Pioneer Natural Resources

Company ("Pioneer Natural Resources") and Pioneer Natural Resources USA, Inc.

("Pioneer-USA") (together, "Defendants")[1] under the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, to

recover costs incurred by the United States in response to the release or threatened

release of hazardous substances from the Commodore Waste Rock Pile ("CWRP") of the

Nelson Tunnel/Commodore Waste Rock Pile Superfund Site ("Site") in Mineral County,

Colorado.  (ECF No. 1 ¶ 1.)

---

[1] Pioneer-USA is a wholly owned subsidiary of Pioneer Natural Resources.  (ECF No. 1 ¶ 2; ECF No. 114 ¶ 2; ECF No. 115 ¶ 2.)  Pioneer Natural Resources is the successor to the CERCLA liabilities of Pioneer Nuclear, Incorporated ("PNI").  *United States v. Pioneer Nat. Res. Co.*, 309 F. Supp. 3d 923, 933 (D. Colo. 2018).  Pioneer-USA is the successor to the CERCLA liabilities of Mesa Limited Partnership ("MLP") and Mesa Operating Limited Partnership ("MOLP").  *Id.* at 929, 931.  The United States alleges that PNI conducted mining operations at the Site between 1982 and 1986, and that MLP and MOLP conducted mining operations at the Site between 1986 and 1989.  (ECF No. 1 ¶ 2.)

Now before the Court is the United States' Unopposed Motion to Enter Consent Decree ("Motion").  (ECF No. 193.)  For the reasons discussed below, the Motion is denied without prejudice.

## I. BACKGROUND

**A.      Factual Background**

The Court previously set forth the basic Site history in an Order granting the United States' early motion for partial summary judgment on corporate successor liability.  *United States v. Pioneer Nat. Res. Co.*, 309 F. Supp. 3d 923 (D. Colo. 2018) ECF No. 88.  The Court presumes familiarity with that Order.

The Site is located approximately 1.5 miles north of Creede, Colorado, and encompasses an area that was mined for silver from the 1880s into the 1980s.  (ECF No. 1 ¶ 7.)  The Environmental Protection Agency ("EPA") has designated two operating units at the Site, the CWRP ("OU1") and the Nelson Tunnel ("OU2").  The United States alleges that Defendants' predecessors conducted mining operations at the OU1 Site between 1982 and 1989.  (*Id.* ¶ 2.)

The Nelson Tunnel was constructed for "locating ore, haulage, and dewatering mines."  (ECF No. 193 at 2.)  In time, the Nelson Tunnel partially collapsed and was abandoned.  (*Id.*)  It continues to drain water from several mines, discharging acid mine drainage into West Willow Creek, which flows into the Rio Grande approximately four miles from the Site.  (*Id.*)

CWRP is a waste rock pile located adjacent to the openings for the Nelson Tunnel and the Commodore No. 5 Tunnel ("Commodore 5").  Over the years, waste rock from

mining of the Nelson Tunnel and Commodore 5 was "cast down the mountainside into the West Willow Creek drainage." (ECF No. 88 at 3.) "Layers of cribbing to contain waste rock comprising the CWRP and makeshift hydraulic structures to convey West Will Creek over and under the CWRP . . . were installed over many years by several mining companies that operated at the OU1 Site." (ECF No. 1 ¶ 12.)

In 2005, the CWPR water conveyance system failed, and the CWRP collapsed into West Willow Creek, releasing contaminated mine waste into the creek. (*Id.* ¶ 36.) On September 3, 2008, the EPA placed the Site on the National Priorities List as provided under Section 105 of CERCLA, 42 U.S.C. § 9605. 73 Fed. Reg. 51368 (Sept. 3, 2008). In 2008 and 2009, the EPA conducted certain time critical removals to stabilize the CWPR. (ECF No. 1 ¶ 39.)

In 2011, the EPA issued a Remedial Investigation ("RI") report for the entire Site to assess the nature and extent of the contamination. (ECF No. 193-1 at 3.) The RI was updated in May 2019, and the EPA is currently conducting a feasibility study for remedial options at the Site. (*Id.*) Once the feasibility study is complete, EPA will prepare and issue a record of decision regarding the remedial action selected, although there is no set timeline for the record of decision. (*Id.*)

In 2016, the United States and Colorado entered an approximately $6 million settlement with CoCa Mines, Inc., which resolved that entity's liability for past and future response costs at the Site. *United States v. Coca Mines, Inc.*, 16-cv-847 (D. Colo., filed June 15, 2016) ECF No. 13. According to the United States, that settlement took into account the defendant's limited ability to pay. (ECF No. 193 at 3.) Of the settlement, 10% was allocated to OU1 and 90% was allocated to OU2. (ECF No. 193-2 at 4.) In

addition, the Asarco Environmental Trust contributed $1,421,462 toward work at OU2.

Prior to March 31, 2017, the EPA incurred $8,501,526.68 in unreimbursed costs for OU1 and "site-wide costs and costs not associated with a particular consent decree, order or activity," referred to as "OU0." (ECF No. 193-2 at 3.) From April 1, 2017 to December 31, 2019, EPA estimates that it incurred $2,164,347.91 in unreimbursed OU1 and OU0 costs. (*Id.* at 4.) This estimate includes Department of Justice costs only from October 1, 2017 to September 30, 2018. (*Id.*) Accordingly, the United States adds an additional $342,121.51 for DOJ costs incurred since October 1, 2018. (*Id.* at 5.) Thus, as of December 31, 2019, EPA had approximately $11,007,996.10 in unreimbursed OU1 and OU0 costs.

In addition, EPA estimates that it has incurred $8,824,487.14 in OU2 response costs as of December 31, 2019. (*Id.*) Taking into account the $4,860,000 from the Coca Mines settlement and the $1,421,462 from the Asarco Environmental Trust allocated to OU2 work, EPA currently has $2,543,025.14 in unreimbursed OU2 response costs as of December 31, 2019. Thus, as of December 31, 2019, the United States has incurred approximately $13,551,021 in unreimbursed response costs at the Site. (*Id.*)

EPA estimates that future costs for OU1 will be approximately $1,125,000, and that future costs for OU2 will be $83.2 million. (ECF No. 193-1 at 4; ECF No. 193-2 at 6.) Thus, total estimated Site-wide future costs are approximately $84.4 million. (ECF No. 193-2 at 6.)

**B.    Procedural History**

The United States filed this action against Defendants on January 19, 2017, to

recover unreimbursed costs incurred in connection with response actions at OU1 only.

(ECF No. 1 ¶ 53.) Defendants filed a counterclaim against the United States, alleging

that the United States is a potentially responsible party ("PRP") under CERCLA and

therefore responsible for certain removal, remediation, and response costs. (ECF

Nos. 61 & 62; *see also* ECF Nos. 114 & 115 (amended counterclaims).) In May 2017,

the United States filed an early partial motion for summary judgment on the liability of

Defendants as successors in interest to prior site operators, which the Court granted.

(ECF Nos. 46 & 88.)

In addition to the instant Motion, there are four motions pending before the Court.

Defendants filed an Unopposed Motion for Partial Summary Judgment on two issues:

(1) the United States is the current owner of the CERCLA facility, and (2) the United

States is a historical owner of the CERCLA facility. (ECF No. 152.) In its response, the

United States clarified that it does not dispute that it owns land underneath a portion of

the CWRP, and owned land under a portion of the CWRP at the time hazardous

substances were disposed. (ECF No. 156.) The United States also filed a partial motion

for summary judgment regarding Defendants' liability under CERCLA, the amount of

response costs, and its third-party defense. (ECF No. 153.) Defendants moved to

exclude evidence from two of the United States' experts, on whom the United States

relied in its summary judgment briefing. (ECF No. 155.) The United States moved to

exclude expert testimony on which Defendants relied in their response to the partial

summary judgment motion. (ECF No. 160.)

On February 26, 2019, the parties filed a joint motion to stay the litigation pending

settlement negotiations, which the Court granted. (ECF Nos. 168 & 170.) The stay was

repeatedly extended as the settlement negotiations and process progressed. (ECF Nos. 178, 181, 183 & 185.)

On November 25, 2019, the United States submitted the proposed consent decree to the Court. (ECF No. 188.) Under the consent decree, Defendants agree to pay $5,775,000 to EPA. (ECF No. 188-1 ¶ 4.) The United States, on behalf of the Department of the Interior ("DOI") and Department of Agriculture ("USDA"), will also pay $425,000 to EPA. (*Id.* ¶ 8.) In return, the United States agrees not to sue or take administrative action against Defendants under Sections 106 and 107(a) of CERCLA for any past or future response costs incurred at the Site. (*Id.* ¶ 15.) EPA agrees not to take administrative action against DOI or USDA under Sections 106 and 107(a) of CERCLA for any past or future response costs in connection with OU1, or any past response costs at OU2. (*Id.* ¶ 16.)

For their part, Defendants agree not to assert claims against the United States for past or future response costs at the Site. (*Id.* ¶ 19.) DOI and USDA agree not to assert any claim for reimbursement under specified sections of CERCLA for past or future response costs associated with OU1, past response costs incurred in connection with OU2, or the consent decree. (*Id.* ¶ 20.)

On December 16, 2019, the United States published a notice of the proposed consent decree in the Federal Register ("Notice"), commencing a 30-day public comment period. 84 Fed. Reg. 68490 (Dec. 16, 2019). The City of Creede, Colorado submitted a comment, objecting to entry of the consent decree as "neither fair nor reasonable." (ECF No. 193-3 at 6.) Creede raised concerns about the inclusion of OU2 in the consent decree, the release of Defendants' liability for future costs at the Site, and the lack of

protection for the environment, the alleged failure to take into account known costs between March 31, 2017, and the standard for judicial review.  On February 19, 2020, the United States filed the instant Motion asking the Court to enter the consent decree.  (ECF No. 193.)  The United States explained why in its view Creede's objections are unfounded (*id.* at 16–20), and included cost estimates for work between March 2017 and December 2019, as well as estimated future costs (ECF Nos. 193-1 & 193-2).  It did not make any changes to the proposal based on Creede's comments.  (ECF No. 193 at 1.)

## II. STANDARD OF REVIEW

A court may either approve or deny a consent decree, and generally may not change the terms.  *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991).  In reviewing a proposed CERCLA consent decree, the district court "must ensure that the agreement is not illegal, a product of collusion, or against the public interest.  The court also has the duty to decide whether the decree is fair, adequate, and reasonable."  *Id.*  "Reasonableness, fairness, and fidelity to the statute are, therefore, the horses which district judges must ride."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990); *see also United States v. ASARCO, Inc.*, 814 F. Supp. 951, 951 (D. Colo. 1993) (a court must "satisfy itself that the settlement is fair, reasonable, and consistent with the purposes that CERCLA is intended to serve" (internal quotation marks omitted; alteration incorporated)).  "If the court discerns a problem with a stipulated agreement, it should advise the parties of its concern and allow them an opportunity to revise the agreement."  *Colorado*, 937 F.2d at 509.

The fairness of a CERCLA consent decree is evaluated in terms of procedural and

substantive fairness. *United States v. Kerr-McGee Corp.*, 2008 WL 863975, at *5 (D.

Colo. Mar. 26, 2008); *Cannons Eng'g*, 899 F.2d at 86. "To measure procedural fairness,

a court should ordinarily look to the negotiation process and attempt to gauge its candor,

openness, and bargaining balance." *United States v. Telluride Co.*, 849 F. Supp. 1400,

1402 (D. Colo. 1994) (quoting *Cannons Eng'g*, 899 F.2d at 86). "Substantive fairness

introduces into the equation concepts of corrective justice and accountability: a party

should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g*, 899

F.2d at 87.

At least three factors are relevant to determining whether a consent decree is

reasonable: whether the consent decree is technically adequate to achieve the goal of

cleaning the environment, whether the consent decree sufficiently compensates the

public for the costs of remedial measures, and whether it reflects the relative strength of

the parties' litigating positions. *Telluride Co.*, 849 F. Supp. at 1402; *accord Cannons

Eng'g*, 899 F.2d at 89–90. "Overlaid on this evaluation is the most important factor:

whether the consent decree is in the public interest and upholds the objectives" of

CERCLA. *Kerr-McGee Corp.*, 2008 WL 863975, at *5.

The Court is mindful that settlement of disputes is encouraged. *Colorado v. City &

Cnty. of Denver* ("*City & Cnty. of Denver*"), 2010 WL 4318835, at *5 (D. Colo. Oct. 22,

2010). "This presumption is particularly strong where a consent decree has been

negotiated by the Department of Justice on behalf of a federal agency, like the EPA,

which enjoys substantial expertise in the environmental field." *Kerr-McGee Corp.*, 2008

WL 863975, at *5. However, a court may not "merely rubber-stamp a consent decree."

*Id.*  In a case where the parties seek the "imprimatur of judicial approval," a court must give the agreement more scrutiny.  *City & Cnty. of Denver*, 2010 WL 4318835, at *5.

### III. ANALYSIS

**A.**     **Procedural Fairness**

A lengthy litigation history and extensive negotiations weigh in favor of finding a proposed consent decree was developed in a procedurally fair manner.  *City & Cnty. of Denver*, 2010 WL 4318835 at *5; *Telluride*, 849 F. Supp. at 1403.  The United States explains that the parties arrived at the agreement in the consent decree after "years of arm's-length negotiations and mediation."  (ECF No. 193 at 9.)  "[E]ven after reaching agreement in principle on key terms, negotiations on the precise language of the Consent Decree took several months" (*id.*), as reflected in the numerous extensions of the stay after the parties reached their initial agreement (ECF Nos. 178, 181, 183 & 185).  The parties were advised by experienced counsel, technical advisors with knowledge of the Site, third-party consultants, and expert witnesses.  (ECF No. 193 at 9.)  The parties also engaged in discovery, including depositions of expert and lay witnesses, and briefed motions for summary judgment.  (*Id.*)  However, the parties do not address whether any third parties, impacted communities, or political representatives (elected or appointed) played any role in the negotiations.

Federal regulations also require that the United States publish the Notice in the *Federal Register* soliciting public comment on the proposed consent decree, which it did in December 2019.  84 Fed. Reg. at 68490; *see Telluride*, 849 F. Supp. at 1404–05.  "This is not an inane exercise. . . . [T]he manifested willingness of the EPA to thoroughly

consider all oral and written comments made with regard to the proposed decree is a key indicator of whether the decree was negotiated in good faith and is fair." *Telluride*, 849 F. Supp. at 1404–05 (internal quotation marks omitted). The United States addressed the substance of Creede's concerns in the Motion.

The Court notes that Notice simply states that the proposed consent decree requires Defendants to pay $5,775,000 for past and future response costs at the Site, and "will resolve all CERCLA claims alleged in this action by the United States against" Defendants. 84 Fed. Reg. at 68490. As the City of Creede points out in its comment, however, the Notice failed to alert the public that the proposed decree would also fully and forever release Defendants from further liability for OU2 costs. Beyond the manifest incompleteness of the Notice, the Court is troubled by the fact that this material omission pertained to an operable unit (OU2) which was never included as a claim or counterclaim in the litigation.

While this omission alone does not counsel against entering the proposed consent decree, the Court views it as a factor in its overall analysis of the fairness of the consent decree. Moreover, the Court recognizes that despite the omission, the public had access to the full agreement, from which it is clear that liabilities for OU2 are also resolved, as evidenced by Creede's objection to including OU2.

In sum, while the Court has some concerns about the procedural fairness of the proposed decree, and would have ideally preferred to have more information pertaining to the issue (missing information which is more fully discussed *infra)*, on the whole it appears to the Court that the agreement was the product of arms-length negotiations after protracted litigation, and thus is procedurally fair.

10

**B.    Substantive Fairness and Reasonableness**

    1.    *Scope of Consent Decree*

As previously noted, Creede objects to the consent decree in part because it resolved Defendants' liability for past and future costs at OU2, although OU2 is not at issue in the litigation.  (ECF No. 193-3 at 3.)  The United States argues that the scope of the consent decree is appropriate because it "comports with the U.S. Supreme Court's established principles" in *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986).  The Court agrees.

Under *Firefighters*, a scope of a consent decree may exceed that of the underlying litigation when the consent decree (1) "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction"; (2) comes within the general scope of the case made by the pleadings; and (3) "further[s] the objective of the law upon which the complaint is based."  *Id.* at 525.  This Court has subject matter jurisdiction over CERCLA cost recovery disputes, and the United States contends that the consent decree furthers the general objective of CERCLA.  (ECF No. 193 at 16–17.)  The Court also finds that Site-wide cost recovery, including recover for OU2 costs, comes within the general scope of the case made by the pleadings.  Here, the parties wish to enter into a broad settlement based upon their activities or predecessors' activities at the Site, which caused release of metals into West Willow Creek.  The Court finds that such a consent decree is not objectionable merely because it releases liability for Defendants for all past and future costs associated with OU2, beyond the relief that could have been granted under the initial complaint.   While OU2 may be properly included in a consent decree, the inclusion

of OU2 impacts the substantive reasonableness of the consent decree, as discussed below.

    2.    *Share of Liability and Litigation Risk*

In evaluating the substantive fairness and reasonableness of a proposed consent decree, a court considers whether the consent decree sufficiently compensates the public for the cost of remedial measures and reflects the relative strength of the parties' litigating positions.  *Telluride Co.*, 849 F. Supp. at 1402.  "[S]ettlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done."  *Cannons Eng'g*, 899 F.2d at 87.  "Common sense suggests that a PRP's assumption of open-ended risks may merit a discount on comparative fault, while obtaining a complete release from uncertain future liability may call for a premium."  *Id.* at 88.  "The manner in which the government has apportioned liability should be upheld whenever there is a reasonable, good faith basis for it." *ASARCO*, 814 F. Supp. at 955.

 In support of the proposed consent decree, the United States contends that the consent decree is substantively fair and reasonable "because it reflects the Parties' careful and informed assessment of the merits of each other's claims, each Party's relative contribution to harm at the Site, and the costs associated with further litigating this case."  (ECF No. 193 at 11.)  The United States explains that the monetary settlement "reflects an appropriate compromise between Parties who asserted substantially different positions during a contested litigation," particularly on the question of divisibility of harm,

an issue raised in the partial motion for summary judgment.  (*Id.* at 11–12.)

The United States further contends that it could recover 100% of costs from Defendants, while Defendants argue that their predecessors contributed a divisible share of between 1.349% and 7.07% of the environmental harm.  The Motion states that this percentage estimate of liability was for "harm at the Site," (*see id.* at 12), although Defendants' response to the partial motion for summary judgment suggests that these percentages relate only to OU1 (ECF No. 157 at 23–24, ¶¶ 170–79; ECF No. 157-22).

Critically, however, there is almost no substantive assessment and certainly no evidence of any kind in the record which addresses the scope or magnitude of Defendants' potential liability at OU2.  The only information before the Court on this issue is the United States' representation that, in an OU2 action, "Defendants would have also likely argued that any divisible share of costs is minimal based on an allegation that the acid mine drainage from the Nelson Tunnel adit was primarily caused by mining activities before the timeframe of Defendants' predecessors."  (ECF No. 193 at 13.)

Additionally, the United States argues that the settlement amount takes into account the parties' "equitable share of Site costs based on available evidence of relative contribution to Site contamination," based on the relative amount added to the CWRP and the length of involvement of Defendants' predecessors at the Site.  (*Id.*)  However, the United States also states that the "evidentiary record of the historical development of the Site is incomplete," and that the "Site was also mined by other non-party operators (now defunct)."  (*Id.* at 12–13.)

Finally, the United States explains that the settlement saves substantial time, costs, and resources.  (ECF No. 193 at 14.)  It explains that resolving OU2 response

costs in the propose consent decree will save the time and expense of a second lawsuit, one that would entail "significant risk" because of the costs to develop the OU2 evidentiary record and the complexity of tracing sources of acid mine drainage. (ECF No. 193 at 13–14.) It also explains that the consent decree would save time and the expense of litigating OU1 through trial. (*Id.* at 14.) The consent decree, the movant contends, would also provide funds now and avoid potential delays by further litigation. (*Id.* at 15.)

Under the consent decree, Defendants would pay $5,775,000, or approximately only 6.84% of the aggregate unreimbursed past costs and estimated future costs of the Site (OU1 and OU2). While the United States represents that this is an "appropriate compromise" given the parties differing views on divisibility of harm equitable share of Site costs, the United States does not provide a clear explication or evidentiary support for its conclusion. For example, there is no indication of whether there are other PRPs and their potential relative liability, although the Motion suggests that other PRPs are "now defunct." (*Id.* at 13.)

While the United States seeks deference to EPA's expertise as to the comparative fault of the parties, the Court need only defer when there is a "reasonable, good faith basis" for the apportioned liability. *See ASARCO*, 814 F. Supp. at 955. Here, the United States has not articulated a "rational (if necessarily imprecise) estimate[] of how much harm each PRP has done." *See Cannons Eng'g*, 899 F.2d at 87. The Court finds there is not a sufficient factual basis to defer to EPA's expertise on apportionment of liability.

Most importantly, given the huge potential range of liability—from 1.349% to 7.07% to 100%—the Court cannot conclude that a settlement for 6.84% of the total unreimbursed past and future costs, and a smaller percentage of total Site costs, is

14

substantively fair and reasonable.

**C.     Public Interest**

The goal of CERCLA is to remediate sites, and have the expenses borne by polluters (or their successors in interest) and not the public.  *Cannons Eng'g*, 899 F.3d at 90–91.  Here, the United States would resolve all liability of Defendants without so much as explaining the extent of their liability for costs at OU2, whether there are other potentially responsible parties, or addressing Defendants' ability to pay.  The United States does not address if or how it will obtain funds for the remainder of the cleanup costs, or whether downstream water users will simply continue to suffer harm.  On the record before the Court, the United States has failed to discharge its burden to demonstrate that recovering approximately 6.84% of unreimbursed past expenses and estimated future Site-wide costs, with no potential other funding for remediation, serves the goals of CERCLA or would be in the public interest.

Finally, the Court notes that in addition to the deficiencies discussed above, the Motion does not address how long remediation will take, when a remedy will be selected for OU2, whether there are impacts to public water systems and the concomitant costs of any such impacts, and whether other state funds are allocated to Site remediation.

## IV. CONCLUSION

For all the foregoing reasons, the Court ORDERS as follows:

1.     The United States' Unopposed Motion to Enter Consent Decree (ECF No. 193) is DENIED because the United States has failed to discharge its burden of showing that the consent decree is fair, reasonable, and in the public interest;

2.      This Order is WITHOUT PREJUDICE to the parties seeking approval of an amended proposed Consent Decree, which meaningfully and substantially addresses the deficiencies the Court has pointed out in the rejected Decree;

3.      The Stay previously entered in this case (ECF No. 170.) is hereby LIFTED; and

4.      The Magistrate Judge is requested to set a status conference as soon as practicable to assess with counsel the matters or deadlines remaining to be set in this action in light of the Court's Order, including without limitation the scheduling of a prompt Final Pretrial Conference.

Dated this 7th day of April, 2020.

BY THE COURT:

_____
William J. Martínez
United States District Judge